[5] A vendee, mortgagee, or remainderman may pay taxes on land in order to protect his interests. Swope v. Missouri Trust Co., 26 Tex. Civ. App. 133, 62 S. W. 947. See, also, Lawrence v. Miller, 86 Ill. 502; Stone v. Tilley, 100 Tex. 487, 489, 101 S. W. 201, 10 L. R. A. (N. S.) 678, 123 Am. St. Rep. 819, 15 Ann. Cas. 524; Cooley on Taxation, supra, p. 812; Mateer v. Jones (Tex. Civ. App.) 102 S. W. 734, 736.

In considering the rule requiring the full payment of the taxes, we think it an appropriate deduction from the authorities to say that, where it is necessary for any one, in order to preserve unimpaired his property rights, to pay the taxes due on any separate tract or parcel of land which has been separately assessed, he has the right to do so; and, where the statutes can be construed to accomplish this end, they should be so construed. Under the constitutional provision before us, the right of the citizen to have any tract of his land free of any lien, except that to secure the taxes levied against it, is an important, substantial, and real property right, not limited by the Constitution by any obligation to pay all other taxes due by him. If we were to say that the taxpayer cannot pay the taxes on one tract of his land without paying on all, or paying all of his taxes, in its final effect on him, as previously stated, we would be awarding a lien not provided by the Constitution, or imposing a quasi-distraint not warranted by that instrument. The general rule that all taxes due must be paid at one time is not to be so blindly followed as to subvert the plain meaning of the organic law.

[6] Without attempting to review the statutes composing our taxation system, we may say, generally, that three methods are provided for securing and collecting taxes: First, foreclosure of and sale under the constitutional lien imposed on each tract of land for the taxes assessed against it; second, the summary process of seizure and sale by the collector; and, third, suit for taxes, and the levy on and sale of all lands (except the homestead) in satisfaction of the judgment. Having provided these three methods of enforced collection of taxes by express and elaborate laws, we cannot say that a fourth method, to wit, that of retaining the lien on each particular tract by refusing to take the taxes due thereon when tendered until all taxes are paid, arises by implication or in virtue of any general rule. We are of the opinion that the tax against each separate tract or parcel of land, in so far as the right of payment is concerned, is to be regarded as a separate tax, and may be paid without at the same time paying other taxes. Since the right of payment exists, the statutory receipt should issue correctly describing the property and the tax, limiting the effect, of course, to the property actually involved and the tax actually paid.

From what we have said, it follows that the first question certified must be answered in the negative, and the second in the affirmative. The answer to the first question makes it unnecessary that we answer the third.

---

**CAUBLE et al. v. HANSON.    (No. 379—3554.)**

(Commission of Appeals of Texas, Section B. Feb. 21, 1923.)

1. **Landlord and tenant ⬅⟿208(1)—Lessee not released from liability on express covenant in absence of novation.**

A lessee is not released from liability on his express covenant to pay rent by an assignment, unless there is an express release of the covenant whereby the lessor was to release him, and to the substitution of the assignee as a tenant.

2. **Landlord and tenant ⬅⟿208(1)—Lessee expressly covenanting to pay rent remains liable after assignment of term.**

Where there is an express covenant to pay rent, the lessee, after assignment of his term, remains liable, and no duty devolves upon the lessor in acquiescing in the assignment to take a new contract of liability from the lessee.

3. **Evidence ⬅⟿69—Courts slow to presume unnatural conduct.**

The courts will be slow to presume unnatural conduct on the part of persons indicative of the weakening of their securities in releasing people already bound to them.

4. **Appeal and error ⬅⟿1084 — Where plaintiff files consent to remittitur, error in fixing reduction of verdict immaterial.**

Where plaintiff, in an action for the balance due on notes, met the requirements of the Court of Civil Appeals as to a remittitur, thereby securing an affirmance of the judgment there, it becomes immaterial on appeal to the Supreme Court to consider or determine error in fixing the reduction in the amount of the verdict.

Error to Court of Civil Appeals of Eighth Supreme Judicial District.

---

⬅⟿For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Suit by Will Hanson against G. C. Cauble and others. From a judgment of the Court of Civil Appeals (224 S. W. 922), affirming a judgment of the district court, defendants bring error. Affirmed.

Blanks, Collins & Jackson, of San Angelo, for plaintiffs in error.

Morrison & Morrison, of Big Springs, for defendant in error.

POWELL, J. The Court of Civil Appeals favors us with a splendid statement of the nature and result of this case in the trial court as follows:

"Defendant in error, Hanson, sued G. C. Cauble, G. C. Cauble, Jr., and T. J. Clegg, plaintiffs in error, for $924, alleged balance due on a note given by the plaintiffs in error Cauble as rental for 13 sections of land in Glasscock county, leased by Hanson to them by written contract entered into between Hanson and the Caubles of date October 1, 1918.

"The defendants Cauble filed a general denial and special answer, to the effect that, although they had leased the premises for which plaintiff sought to recover rent, shortly after making such lease they had conveyed the same to their codefendant, Clegg, upon the assumption by him of all obligations resting upon them under the lease contract, and that with knowledge of such assignment the plaintiff had accepted rents from the said Clegg, and had released them from further liability on the contract.

"The defendant Clegg filed a general denial, and by way of special answer and cross-action asserted that, although the plaintiff had leased 13 sections of land, he failed to procure and deliver 2 of the sections, and because of such failure his pasturage had failed, the range became inadequate to take care of his cattle, and the value of such leased premises depreciated in a far greater amount than that which the plaintiff was seeking to recover, and as a further result of the shortage of pasturage and water he was compelled to, and did, expend $500 for extra feed, none of which would have been used had the plaintiff delivered the proper acreage with adequate water supply; that he was compelled to shift and move the cattle about from pasture to pasture, by reason of which fact they failed to take on flesh as they should have done, and were thereby damaged in the sum of $1,000.

"Upon trial before the court without a jury, judgment was rendered for the plaintiff against all defendants for $547.88, with interest from the date of the judgment, and against the defendants on their cross-action. From which judgment all of the defendants appealed.

"The court found that the rental value of the two sections of land which Hanson failed to deliver was $450, and gave credit upon the note for that amount."

Upon appeal, the Court of Civil Appeals, upon the filing of a remittitur by defendant in error in the sum of $50, as required by said court, affirmed the judgment of the district court. See 224 S. W. 922.

Upon proper application therefor, the Supreme Court granted a writ of error, with the notation that the decision of the Court of Civil Appeals herein appeared to be in conflict with the opinion of the Court of Civil Appeals at San Antonio in the case of Ascarete v. Pfaff, 34 Tex. Civ. App. 375, 78 S. W. 974.

As showing the nature of the assignment in the application under which the Caubles entirely disclaim liability, we quote as follows from the opinion of the Court of Civil Appeals:

"It is not contended by the plaintiffs in error that Hanson agreed to relieve the Caubles from their covenant to pay the rent stipulated in the lease contract or to relieve them of liability upon the note which they had given to cover the rental, nor is there any finding to that effect by the trial court, but the assignment proceeds upon the theory that, as a matter of law, the Caubles were relieved of liability upon the note by the assignment of the lease, of which the lessor became later advised and to which he assented, his subsequent acceptance of payments upon the note made by Clegg, and his action in seeking to hold both the lessee and the assignee liable for the payment of the rent."

The Court of Civil Appeals, in overruling above assignment of error, speaks as follows:

"On October 7, 1918, the defendants Cauble assigned their leasehold interest to the defendant Clegg, and in part consideration for such assignment Clegg assumed the payment of the note sued upon.

"The rendition of the judgment against the defendants Cauble, is assigned as error for the reason that the undisputed evidence shows that the Caubles sold and transferred the entire lease contract together with the premises covered thereby to their codefendant, Clegg, who had taken possession thereof with the knowledge and consent of the plaintiff, and that thereafter the plaintiff had accepted and received rental payments from Clegg for such premises knowing that they had been sold, transferred, and assigned to him by the Caubles.

"The evidence discloses that there was an assignment of the lease by the Caubles to Clegg rather than an underlease or subletting. Railway Co. v. Settegast, 79 Tex. 256, 15 S. W. 228; Davis v. Vidal, 105 Tex. 444, 151 S. W. 290, 42 L. R. A. (N. S.) 1084; Forrest v. Durnell, 86 Tex. 647, 26 S. W. 481.

"The rules of law governing the disposition of the assigned error seem to be well settled. Liability for rent is based upon privity of contract or privity of estate. Where there is an express covenant to pay, the lessee is held in privity of contract. In the absence of an express covenant to pay, the liability arises upon an implied obligation whereby he is held in privity of estate. In the absence of an express covenant to pay rent, if the lessee parts with his estate, with the consent of the lessor, the privity of estate is thereby destroyed, and the lessee is not further obligated to pay rent, since there is nothing upon which to base the implied obligation. In contrast with such cessation of the lessee's liability upon the implied

covenant, the rule, where there is an express covenant to pay rent, is that the lessee after assignment remains liable on his express covenant, as in such case, though the privity of estate is terminated by the assignment, the privity of contract is unaffected. The lessee remains liable to the lessor on his express covenant to pay even though the assignment was made with the consent of the lessor. Nor is this continued liability affected by the fact that the lessor has accepted rental payments from the assignee. The receipt of such rent from the assignee does not amount to a novation of the contract or release of the lessee, but is the assertion of a right which accrued to the lessor as an incident of the assignment. Taylor v. DeBus, 31 Ohio St. 468. The lessee is not released from liability on his express covenant to pay rent by an assignment unless there is a novation of the contract whereby the lessor agrees to release him and to the substitution of the assignee as the tenant. The institution of an action by the lessor against the assignee to recover the rent does not itself affect the lessee's liability to the lessor. At his election the lessor may sue either the lessee or the assignee, or both at the same time, though he can have but one satisfaction.

"In Coal Co. v. Sharp, 73 W. Va. 427, 80 S. E. 781, 52 L. R. A. (N. S.) 968, Ann. Cas. 1916E, 786, the coal company sued its lessee, Sharp, to recover a rental royalty. Sharp had assigned his lease to the 'Raven Coal & Coke Company. There was an express agreement to pay the rental royalty. The court said:

"'But plaintiff also insists, with more merit in our opinion, that Sharp is still liable to it, even though he assigned the lease to the Raven Coal & Coke Company, whether with or without plaintiff's assent. If the lessee assigns the lease, even with the lessor's assent, the former remains liable on his covenant to pay rent, although rent is accepted from the assignee, unless the lessor expressly agrees to release the lessee and substitute the new tenant in his stead. Port v. Jackson, 17 Johns. (N. Y.) 239; Taylor v. DeBus, 31 Ohio St. 468; Pfaff v. Golden, 126 Mass. 402; Carley v. Lewis, 24 Ind. 23; Jones v. Barnes, 45 Mo. App. 590; Wilson v. Gerhardt, 9 Colo. 585, 13 Pac. 705; Oswald v. Fratenburgh, 36 Minn. 270, 31 N. W. 173; Frank v. Maguire, 42 Pa. 78; Bonetti v. Treat, 91 Cal. 223, 27 Pac. 612, 14 L. R. A. 151.

"'The covenant to pay rent "inheres in the estate as a covenant real, and binds the assignee of the term, by reason of his privity of estate, to pay the rent accruing during his ownership and possession of the estate, so that, after an assignment of the lease, the lessor has a double and several security for the payment of his rent, either or both of which he may pursue until satisfaction is obtained. Therefore the receipt of rent from the assignee of the lessee does not amount to a novation or release of the lessee, but is that assertion of a right, which accrues to the lessor as an incident to the assignment." Taylor v. DeBus, supra; Carley v. Lewis, 24 Ind. 23; Whetstone v. McCartney, 32 Mo. App. 430.

"'In the latter case the court said: "There are two ways in which a lessee may be liable to his lessor; one arises from his express covenant to pay, whereby he is held in privity of contract; the other arises, in the absence of an express covenant to pay rent, on an implied obligation, whereby he is held in privity of estate. In the latter case, if he parts with the estate, with consent of lessor, thereby destroying the privity, there is no further obligation to pay rent, since there is nothing upon which to base the obligation. But if he has expressly covenanted to pay, the contract lasts till discharged, and the covenant may be said to run with the land, and this is so even though the lessor has consented to the assignment by the lessee and accepted rent of the assignee. The assignee is likewise liable to the original lessor for the term he occupies, not by reason of a promise, but by reason of the privity of estate. And the lessor may pursue one, or both, at the same time, though he will be entitled to but a single satisfaction."

"'The assignment of the lease by Sharp to the Raven Coal & Coke Company, even with the assent of the lessor, did not impair the liability of the original lessee on his covenant to pay rent. The assignment did not annul this express obligation, or constitute an implied release therefrom. While the privity of estate between plaintiff and Sharp was terminated by the transfer, the latter nevertheless remained liable, at the option of the former, for rent thereafter accruing, because of' the continuing privity of contract.' See, also, 16 R. C. L. title, Landlord & Tenant, §§ 344–347, 352, 676; Taylor, Landlord & Tenant (9th Ed.) §§ 371, 372, 517; 24 Cyc. 1177, 1178; notes in 52 L. R. A. (N. S.) 969, and Ann. Cases 1916E, 789."

It was above holding of the Court of Civil Appeals which appeared to the Supreme Court, in granting the writ, to be in conflict with the opinion of the Court of Civil Appeals in case of Ascarete v. Pfaff, supra. After carefully reading the latter case, it is clear to us that the instant case is in direct conflict with several expressions of the court in the Ascarete Case.

The Court of Civil Appeals at Amarillo, in the recent case of Goffinet et al. v. Broome & Baldwin, 208 S. W. 567, was confronted with a fact case almost identical with the case at bar. In that case the Amarillo court reviewed the case of Ascarete v. Pfaff, supra, and declared the same unsound. In its review of said case the court went into the matter very fully, and so exhaustively reviewed the Texas decisions upon the point in controversy that we have decided to quote from the Amarillo court as follows:

"The third, fifth, sixth, and ninth assignments will be considered together. The question is whether appellants, as sublessees of appellees, Broome & Baldwin, bound by an express covenant to pay them rents, are liable for rents accruing after they had assigned the lease to Lard, with the knowledge of appellees. We find in the statement of facts a letter from Joe J. Mickle to Lard, dated July 20, 1915, as follows: 'We served notice on Messrs. Baldwin & Broome of the cancellation of the lease contract on the Roberts county ranch, which you occupied, and stated to

them that if they desired the contract could be canceled so as to expire at once, or any time this month; or, if preferable, to terminate nine months from the date notice was given, which would make it mature April 15, 1916. I have just had a talk with Mr. Baldwin, and he states that he neglected to say to you that the cancellation could take effect at this time if you so desire, and I write to know if it would suit you to cancel the contract during this month or if you prefer to hold it until April 15, 1916.'

"Under the decision of the Supreme Court, in the case of G., C. & S. F. Ry. Co. v. Settegast et al., 79 Tex. 256, 15 S. W. 228, we think the evidence is sufficient to show that both Mickle and appellees had accepted Lard as the lessee of the land. In fact, we fail to find in the record any direct or positive evidence to the contrary. So the question then, under these assignments, differently stated, is, Did the acceptance of rents from Lard and the recognition of Lard as the assignee of the lease from appellants, as a matter of law, release appellants from all liability upon their express covenant to pay rents? In Ascarete v. Pfaff, 34 Tex. Civ. App. 375, 78 S. W. 974, Judge Fly says: 'The rule is that when a lessee, with the consent of the landlord, assigns the lease for the term, the assignee becomes charged with the rent, and the original lessee is no longer liable for the rent unless it be specially agreed otherwise.'

"The first case cited in support of the holding is Loustaunau v. Lambert, 1 Tex. Civ. App. 434, 20 S. W. 937. The opinion in the Loustaunau Case was written by Judge Collard, who was then a member of the Third Court of Civil Appeals, and in which it is said: 'When Wilson became the owner of the lease, he assumed the obligations of the original lessee, as he was bound by law so to do; and upon the transfer of the lease to Moke, he in turn became so bound; and any fact tending to show that the landlord recognized such substitution was legitimate. Their acceptance of either of them as lessee, or as the party to whom they should look for payment of rent, such party being bound so to do in law or by contract, amounted to a waiver of lien upon the goods of the original tenant.'

"The suit was instituted by Mary Lambert and others, creditors of Richard Lambert, against Loustaunau & Co., to enjoin Loustaunau & Co. from executing a judgment by the said Loustaunau & Co. against Richard Lambert, in the sum of $2,625, and to restrain them from receiving and collecting from the clerk of the court said sum, which had been realized from the sale of the stock of goods belonging to Richard S. Lambert, and levied upon by Loustaunau & Co. under a distress warrant for rents due and to become due to them from Richard S. Lambert. It appears that Lambert became insolvent and had absconded, and that Wilson became the owner of the leasehold estate, and that with the consent of Loustaunau & Co. Wilson had leased the premises to Moke for the unexpired term. It further appears that Loustaunau had received rents from Moke for one month. It further appears that Mrs. Lambert, together with other creditors of the absconded debtor, Richard S. Lambert, recovered judgment and foreclosed their attachment liens upon the

goods levied upon. The plaintiff asked the court to charge the jury: 'That if they find from the evidence that subsequent to the lease by Loustaunau & Co. the said lease was assigned and transferred to one Ben Moke, by and with the consent of said Loustaunau, or by them, and that said lease is for the whole of the unexpired term of the Lambert lease, or any part thereof, provided that you find that said Ben Moke was accepted by Loustaunau in lieu of Richard S. Lambert's lease, then you will find for the plaintiffs.'

"This charge was given, and is made the basis of the fifth assignment of error. In discussing the action of the court, Judge Collard said: 'The expression, "or any part thereof," should possibly not have been used in the charge, because the undisputed evidence shows that the entire unexpired term was assigned to Moke, which, as we have before seen, rendered him liable for the performance of all the undertakings of the original lessee, for rent past due and unpaid as well as that to become due, the acceptance of such obligations by the landlord in legal effect being an acquittance of Lambert and a release of the rental lien upon the goods on the rented premises.'

"This holding seems to sustain the rule announced by Judge Fly in the Ascarete Case. The next case cited by Judge Fly as sustaining the rule is Giddings v. Felker, 70 Tex. 176, 7 S. W. 694. That was a suit by Giddings against Hardin and Felker to recover rent for land leased to Hardin, and subsequently subleased by Hardin to Felker, without the consent of Giddings. The trial court found that Felker did not absolutely agree to pay the rent that Hardin had contracted to pay plaintiffs, unless he should realize from the crops to be raised on the place a sufficient sum to enable him to do so. The Supreme Court, speaking through Judge Maltbie, said: 'The question for determination is whether, under the facts of this case as found by the court, judgment should have been rendered against Felker for the sum that Hardin had agreed to pay. According to the findings Felker is subtenant and not liable to appellants for rents unless by virtue of his undertaking with Hardin. Wood on Landlord and Tenant, 545, 547; Harvey v. McGee, 44 Tex. 412. But if Hardin had assigned his term, Felker then would have been liable upon all the terms of the lease.' In that case the court makes no comment whatever, nor announces any rule as to the liability of Hardin, except to affirm the judgment. The case was tried by the court, resulting in a judgment against Hardin for the full amount of the rent agreed to be paid by him. It is not, in our opinion, authority for the rule announced by Judge Fly in the Ascarete Case. The third case cited by Judge Fly is Le Gierse v. Green, 61 Tex. 128. The facts of that case necessary to be considered are that Le Gierse & Co. became the assignee of a lease entered into between Green, as landlord, and Bear Bros. & Hirsch, as tenants, and Judge Stayton held that as such assignees they became liable to pay the rents in accordance with the agreement made between the landlord and the original lessees. Green had sued Le Gierse & Co., G. W. Bird & Co., and Focke & Wilkins, to recover the rents due under the Bear Bros. & Hirsch contract, alleging that all of the defend-

ants had become purchasers of the leasehold interest of Bear Bros. & Hirsch. Le Gierse & Co. contended that they had leased the property by independent agreement from Bear Bros., under which they were authorized to collect the rents and apply the proceeds to the satisfaction of debts due them as the creditors of Bear Bros. & Hirsch. The suit resulted in favor of plaintiffs against the defendants, and judgment was rendered in the sum of $3,000. Under the rule announced by Judge Fly, Bear Bros. & Hirsch would have been released, but Judge Stayton said: 'The effort of Green to collect from Bear Bros. & Hirsch was but the exercise of a legal right; for they were bound to him by their contract, and its exercise could in no way have misled or prejudiced the appellants, but would have been to their benefit if successful.'

"Our investigation has convinced us that the weight of authority in other jurisdictions is against the rule announced by Judge Fly, and this is why we are discussing the authorities cited by him to sustain his holding. The rule announced in the Ascarete Case is followed in Kennedy v. Groves et al., 50 Tex. Civ. App. 266, 110 S. W. 136, in which Judge McMeans says: 'There is no doubt that the acceptance of Groves by Wilson as lessee under Kennedy would, in the absence of evidence showing a contrary intention, operate as a relinquishment of his landlord's lien upon the property of Kennedy remaining on the rented premises.'

"In Demetri v. McCoy, 145 S. W. 293, Chief Judge Pleasants says the evidence shows that McCoy leased the premises to appellant, and that appellant sold out his business to Lawrence, who paid rents to appellee's agent for several months, beginning with February, 1908; that when the February rent became due plaintiff sent a receipt for the rent to his agent, Bickford, who presented it to Lawrence; that Lawrence refused to pay the rent unless the receipt was made out in his name. Upon being notified of this fact plaintiff inserted Lawrence's name in the receipt in lieu of the defendant's, and that receipts for rent for the months of March and April were made to Lawrence, as the rents were paid by him. McCoy testified that he never consented to accept Lawrence as his lessee and release appellant Demetri from his contract; that when he was notified that Lawrence wanted the receipt made out in his name he supposed Lawrence had become a partner in the business. Chief Judge Pleasants says that: 'The evidence set out is sufficient to sustain the finding of the trial court that appellee did not agree to release the appellant from his contract and accept Lawrence as his lessee. Appellee swears that he made no such agreement, and he is corroborated by Lawrence, who swears that he did not assume the obligations of the contract. If Lawrence was insisting on the right to hold the property as sublessee, and offering to pay the rents, it may be that under the rule announced in the cases of Ascarete v. Pfaff, 34 Tex. Civ. App. 375, 78 S. W. 974, and Railway Co. v. Settegast, 79 Tex. 256, 15 S. W. 228, appellee, having accepted rents from him for several months, would not be permitted to deny him the right to hold the property for the term of the lease. But no such question is presented in this case. The acceptance of rent from Lawrence for several months would not of itself release the appellant for the balance of the term; nor is it conclusive evidence of the fact that appellee agreed to release the appellant. The question is one of fact.'

"That an assignment by the lessee does not affect his subsequent liability upon the express covenants contained in his lease is sustained by such an overwhelming weight of authority in other jurisdictions that we feel constrained to dissent from the holding of Judge Fly in the Ascarete Case, and we incline to the opinion that the language quoted from the Le Gierse Case shows that Judge Stayton also entertained the contrary view. We will not unnecessarily prolong the opinion by quoting at length from the authorities which we think justify us in our holding, but refer to 1 Tiff. L. & T. § 157 (2), p. 962; 2 Underhill on L. & T. § 650, p. 1092; 24 Cyc. pp. 1177, 1178; 16 R. C. L. §§ 343, 345, 347; Kanawha-Gauley Coal & Coke Co. v. Sharp, 52 L. R. A. (N. S.) 968, note."

[1] Neither the opinion of the Court of Civil Appeals at San Antonio nor the Amarillo court reached the Supreme Court in any way. In a word, the contention of the Caubles is that they are not liable on their rent contract and note to Hanson, because the latter acquiesced in their assignment thereof to Clegg and accepted rents from the assignee; that such conduct on Hanson's part constituted a set of circumstances which, as a matter of law, released the Caubles from liability on their express covenants and contracts. We cannot assent to such a contention. It is elementary, of course, that the Caubles will be liable on their contract unless released therefrom by Hanson. As already stated, it is not claimed that Hanson expressly released them. Therefore we are limited to the contention that his acts were circumstances from which a release must be implied, as a matter of law. There is no statute in Texas which provides that the circumstances here present shall constitute a release of the original lessee. Consequently the circumstances could have that effect as a matter of law only if all reasonable minds would draw the same conclusion from them. Certainly, it cannot be said that all reasonable minds would conclude that the actions of Hanson herein clearly evidenced an intention on his part, practically without any consideration, to release men who were bound to him under a lawful contract. Therefore, at most, it could only be a question of fact, for court or jury as the case might be, as to whether or not the circumstances we have here showed a release of the Caubles by Hanson. This question of fact was decided adversely to the Caubles by both the district court and Court of Civil Appeals.

As stated by the Court of Civil Appeals at Amarillo, in their opinion above quoted from, and by the Court of Civil Appeals herein, the overwhelming weight of authority in other states is against this contention of plain-

tiffs' in error herein. Not only so, but, as we construe its decisions, as reviewed in the opinions hereinabove set out, the Supreme Court of Texas has never, directly or indirectly, sustained this contention of counsel. We agree with the Amarillo court in its conclusion that the opinion of Judge Stayton in the case of Le Gierse v. Green, 61 Tex. 128, is contrary to this contention of counsel and to the views of the Court of Civil Appeals in Ascarete v. Pfaff, supra. Not only the language of Judge Stayton quoted by the Amarillo court, but the last three or four paragraphs of that decision, show, we think, that the circumstances we have here do not, as a matter of law, release an original lessee.

Therefore, as far as our Supreme Court has expressed itself upon this question, even though indirectly, we think it has been to sustain the action of the Court of Civil Appeals herein in overruling this assignment. There certainly was sufficient evidence to sustain the finding of the trial court that there was no release, and the Court of Civil Appeals did not err in affirming that finding.

[2] The contention of counsel for the Caubles is that, if Hanson wanted to hold the Caubles, the duty devolved upon him, in acquiescing in the assignment by the Caubles to Clegg, to take a new contract of liability from the Caubles. We cannot agree with this reasoning. Why should Hanson be the aggressor under these circumstances? He already had a binding obligation executed by the Caubles. They were already liable to him. A new contract would not add anything to that liability. The usual presumption, as between the parties, is that a man owes a note he executes as long as it is unpaid and in the hands of the payee. Therefore, if the maker of a note wishes to be relieved from liability, it seems to us that he is charged with the duty of interesting himself and securing a release and surrender of his note. He is the one who has something to gain, and his real road to safety is to obtain an express release, and not rely upon an implied release which is always difficult to establish.

Hanson had a perfect right to rely upon his contract and note. He could have refused to consent to an assignment by Cauble to Clegg. On the other hand, if he wanted to do all he could to accommodate the Caubles and let them try to work out their debt to him through another, certainly the Caubles should not be permitted to penalize him for his generosity. It might frequently happen that a landlord would be willing to help the original lessee in every way he could, except to go to the limit of releasing him from liability and wholly endangering his contract. A tenant under a long lease, frequently desires to vacate premises and do something else. Under such circumstances, a landlord might be willing to permit the tenant to make other arrangements for the use of the property. If the original lessee is solvent, the landlord would likely not object to the efforts of the original tenant to work out his own problems and put some one else on the premises, if the new tenant was acceptable on moral grounds. On the other hand, a landlord might, and would likely, object to the premises being turned over to a third party if the original lessee wished to escape liability under his contract. It seems to us that this is too clear for argument. When a man makes a binding contract for a number of years, he must pay it himself or be released from doing so, either by the express act of the payee in the note, or impliedly released by acts of the payee inconsistent with the theory that he was still holding the maker of the note liable thereon.

The lower courts were entirely justified in holding that the circumstances present here were not sufficient to amount to a release by implication. A mere acquiescence in the occupation of the premises by another and acceptance of rents from the latter were entirely consistent with the theory that Hanson was willing to help the Caubles work out the contract through Clegg, if they could do so. As Judge Stayton said in the Le Gierse Case, the collection of rents from Clegg by Hanson "would have been to their benefit if successful." These circumstances are not inconsistent, in any sense, with the intention of Hanson to hold the Caubles if Clegg failed to pay the amount due on the Cauble note. In a somewhat analogous situation, Judge Stayton, in the Le Gierse Case, speaks as follows:

"Nothing short of an agreement, express or implied, binding in law, would relieve them from such liability, and the court did not err in instructing the jury that 'the mere fact that the plaintiff, by suit,' tried to collect the rents of Bear Bros. & Hirsch would not be sufficient to establish any such implied agreement; and such fact of suit, even if coupled with a knowledge on the part of Green that the defendants were renting the property and applying the rents to the payment of the debts due them from Bear Bros. & Hirsch, would not raise any implied agreement of Green that the rents should be so applied.'"

[3] It frequently happens that a man buys land on credit. Later he sells it to another upon the assumption by the latter of the payment of the notes still held by the original grantor against the original grantee. The second grantee pays the original grantor certain amounts on these notes. But this does not release the original maker of the notes from his liability. So it is with all such obligations. In the natural order of things, men of ordinary prudence do not weaken their securities by releasing people already bound to them. This is particularly so where there is no consideration for such release.

The courts will be slow to presume the unnatural and imply a release, especially as a matter of law.

We are convinced that the conduct of Hanson could have been so inconsistent with the theory that he was still looking to the Caubles on this contract a jury would have been justified in implying a release by Hanson of the Caubles in that connection. By way of illustration, if Hanson had not only acquiesced in the occupation of the premises by Clegg but had taken a new note from Clegg alone for the balance then due upon the Cauble contract, this issue of implied release might have been raised. But Hanson did no such thing. He held the Cauble notes, and did not ask Clegg to execute any contract. Therefore, as heretofore stated, we think the Court of Civil Appeals correctly overruled this assignment of counsel.

The remaining assignments of error are treated by the Court of Civil Appeals, and we think the rules of law announced by that court are correct. Therefore we shall not discuss them, except to say that we are inclined to think that court erred in applying the law to the facts of this case, as found by the district court, in one instance, which we shall now discuss.

Hanson executed this lease to the Caubles, covering an eight-month period. He conveyed the lessees 13 sections of land for a total consideration of $2,925, and the evidence shows that this was based upon an average cost of $225 per section. The lease contract itself shows that two of the sections mentioned therein were not at that time under the control of Hanson, but he contracted to lease them and later turn them over to the Caubles. He did not succeed in doing so. The district court entered judgment upon the theory that the proper measure of damages for this breach of contract was the value of the shortage—two sections at $225 each. The district court further found that no other damages, sued for by the defendants in that court by way of cross-action, were in the contemplation of the parties, and were therefore too remote. We think there is ample evidence to sustain this finding of the trial court. The record contains much evidence that all the parties contemplated, and practically agreed, all along, that if the two sections were not secured the penalty would be a reduction of $450 from the face of the note and as of the date of its execution. Clegg, himself, in sending in a remittance at one time, made this very settlement. The bank which held the note prevailed upon him to hold up this deduction and take it out later if the two sections of land were still not supplied. Clegg agreed and sent in a full payment at that time giving notice of deductions he would ask later. But in such correspondence he did not mention the items he later sued for. These facts speak strongly in support of the trial court's judgment that the proper reduction was $450, applied as aforesaid. We are inclined to think that the district court really entered the proper and just judgment in this case.

But the Court of Civil Appeals held that the lessees, instead of accepting the reduction awarded by the trial court, had the right to ask for special damages within the contemplation of the parties as reasonably likely to flow from this breach of the contract. Upon that basis, the Court of Civil Appeals sustained the finding of the trial court that part of the special damages pleaded was remote, but overruled the trial court, and held that, under the facts of this case, Hanson could be held liable for the $500 which Clegg alleged he expended for feed, which purchase of extra feed was made necessary by the 2-section shortage in the grazing lands covered by the lease. Upon that finding the Court of Civil Appeals applied that measure of reduction to the amount due on the note, and, as the trial court had reduced the note by only $450, the Court of Civil Appeals required a remittitur of $50 if the judgment of the trial court was to be affirmed.

[4] Hanson met this requirement as to the remittitur and filed the same, thereby securing an affirmance of the judgment of the district court. So it is now immaterial for us to decide whether the district court or Court of Civil Appeals erred in fixing the reduction to be applied to the note. If any error was committed, it was against Hanson. He agreed to it, and is bound thereby. We think the plaintiffs in error, at any rate, received all they were entitled to, under the facts of this case as found by both of the lower courts. Therefore we recommend that the judgment of the Court of Civil Appeals be affirmed.

CURETON, C. J. The judgment recommended in the report of the Commission of Appeals is adopted, and will be entered as the judgment of the Supreme Court.