**ELAND ENERGY, INC., Appellant**

v.

**SEAGULL ENERGY E & P, INC., Appellee.**

No. 14–02–00709–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Feb. 19, 2004.

Rehearing En Banc Overruled June 10, 2004.

J.D. Page, Houston, TX, Alida C. Hainkel and Carl D. Rosenblum, New Orleans, LA, for appellants.

William P. Maines, Houston, for appellees.

Panel consists of Justices FOWLER and FROST (BRISTER, Former C.J. not participating).

## OPINION

KEM THOMPSON FROST, Justice.

In this breach-of-contract case, we decide whether certain oil and gas operating agreements impose liability on former working-interest owners to reimburse the operator for costs paid by the operator after the former working-interest owner assigned its entire interest to a third party. Under the unambiguous language of the agreements in question, we find no such liability. Therefore, we reverse the trial court's judgment to the extent it awards damages against appellant/defendant Eland Energy, Inc., and we render judgment that appellee/plaintiff Seagull Energy E & P, Inc. take nothing.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Seagull Energy E & P, Inc. (hereafter, the "Operator") is the designated operator in operating agreements relating to two oil and gas leases of submerged lands on the Outer Continental Shelf off the coast of Texas. After the working-interest owners in these two leases entered into operating agreements regarding operations on each respective lease, Eland Energy, Inc. acquired a working interest in both leases (collectively referred to herein as "Working Interests"). As part of the assignment of the Working Interests to Eland, Eland agreed to assume and be liable for a proportionate part of the obligations created by the existing offshore operating agreements pertaining to each interest.

Less than two years after obtaining title to the Working Interests, Eland decided to have these interests sold at an auction that required no minimum bid. In this auction, Nor–Tex Gas Corporation was the successful bidder, and under the terms of the auction, Eland (hereafter, the "Assignor") assigned the Working Interests to Nor–Tex (hereafter, the "Assignee"), which paid $500 for each as consideration for the assignments. As part of these assignments, the Assignee agreed to assume and be liable for a proportionate part of the obligations created by the existing offshore operating agreements pertaining to each of the Working Interests. The trial court determined that the Assignor validly assigned the Working Interests to the Assignee, and the Operator does not contend otherwise on appeal.

The Assignee defaulted in its obligations under the operating agreements by failing to reimburse the Operator for its share of the costs relating to the Working Interests. The Assignee eventually filed for bankruptcy under Chapter 7 of the United States Bankruptcy Code. After the Assignee's default, the Operator demanded reimbursement from the Assignor. While the Assignor owned the Working Interests, it reimbursed the Operator for its share of the operator-incurred costs; however, the Assignor refused to reimburse the Operator for costs incurred after it assigned the Working Interests to the Assignee.

The Operator asserted breach-of-contract claims against the Assignor and the Assignee and sought reimbursement as to costs incurred after the Assignor assigned the Working Interests to the Assignee. The Operator filed a motion for summary judgment, arguing that the Assignor and the Assignee were jointly and severally liable as a matter of law for breach of the offshore operating agreements relating to the Working Interests. As to the Assignor, the Operator asserted (1) the Assignor was a party to these operating agreements; (2) the Assignor therefore was required to reimburse the Operator even after it assigned the Working Interests; and (3) the Assignor's assignment of the Working Interests did not affect the Assignor's liability under the operating agreements.

The Assignor opposed the Operator's summary-judgment motion and filed its own motion for partial summary judgment, asserting that, under the unambiguous language of the operating agreements, the Assignor did not have any contractual obligation to reimburse the Operator for costs incurred after the Assignor assigned the Working Interests.

The trial court granted the Operator's motion and denied the Assignor's motion.

In its interlocutory summary-judgment order, the trial court ruled: (1) the Assignee is liable to the Operator for breach of the operating agreements; (2) although the Assignor assigned the Working Interests to the Assignee, as a matter of law, the Assignor remains liable for performance of its obligations under the operating agreements; and (3) the Assignor breached the operating agreements by failing to reimburse the Operator for the proportionate share of costs relating to the Working Interests after the Assignor assigned these interests to the Assignee.

After a bench trial on the remaining issues, the trial court signed a final judgment that incorporated the court's prior summary-judgment rulings and that made the following additional rulings: (1) the Assignor and the Assignee are jointly and severally liable to the Operator for $268,418.99, plus prejudgment interest, postjudgment interest, costs, and attorney's fees; and (2) based on the Assignor's cross-action against the Assignee, the Assignee must indemnify the Assignor for all of the amounts awarded the Operator against the Assignor in the judgment. The trial court made findings of fact and conclusions of law stating, among others things, that the actual damages awarded the Operator fairly and reasonably compensate the Operator for the failure of the Assignor and the Assignee to comply with the operating agreements.

## II. ISSUE PRESENTED

On appeal, the Assignor asserts, among other things, that the trial court erred in granting the Operator's motion for summary judgment and in denying the Assignor's motion for partial summary judgment. The Assignor argues that the trial court erred by holding it liable under the operating agreements for costs incurred by the Operator after the Assignor assigned the Working Interests to the Assignee. The

Assignor asserts that, under the unambiguous language of the operating agreements, it owed no such contractual obligation to the Operator.

## III. STANDARD OF REVIEW

The Assignor asks this court to review the trial court's denial of its motion for partial summary judgment; however, because this motion did not seek a final judgment, we cannot review the trial court's denial of the motion. *See CU Lloyd's of Texas v. Feldman*, 977 S.W.2d 568, 569 (Tex.1998); *General Res. Org., Inc. v. Deadman*, 907 S.W.2d 22, 28 (Tex. App.-Corpus Christi 1995, writ denied) (holding appellate court cannot review trial court's denial of motion for summary judgment after trial on the merits). In reviewing the trial court's summary judgment that holds the Assignor liable as a matter of law under the operating agreements, we must determine whether the Operator showed there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See KPMG Peat Marwick v. Harrison County Housing Fin. Corp.*, 988 S.W.2d 746, 748 (Tex.1999). In conducting our review, we take as true all evidence favorable to the non-movant (Assignor), and we make all reasonable inferences in its favor. *See id.* The Operator is entitled to summary judgment if it pleaded and conclusively established each element of its breach-of-contract claim. *See Science Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex.1997).

## IV. ANALYSIS

**Did the Assignor have an obligation under the operating agreements to pay the Operator a share of the operator-incurred costs and expenses after the Assignor assigned the Working Interests?**

In its first issue, the Assignor argues the trial court erred by holding it liable under the operating agreements because, under the unambiguous language of these contracts, the Assignor had no obligation to reimburse the Operator for costs or expenses incurred after the Assignor assigned the Working Interests to the Assignee. In construing these operating agreements, our primary concern is to ascertain and give effect to the intentions of the parties as expressed in the contracts. *Kelley–Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex.1998). To ascertain the true intentions of the parties to the contract, we examine the entire agreement in an effort to harmonize and give effect to all of the provisions of the contract so that none will be rendered meaningless. *MCI Telecommunications Corp. v. Texas Utilities Elec. Co.*, 995 S.W.2d 647, 652 (Tex.1999). When a written contract is so worded that it can be given a certain or definite legal meaning or interpretation, it is not ambiguous, and courts may construe it as a matter of law. *American Manufacturers Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157–158 (Tex. 2003).

Whether a contract is ambiguous is a question of law for the court. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex.1996). A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation. *Id.* We cannot rewrite the operating agreements or add to their language under the guise of interpretation. *See American Manufacturers Mut. Ins. Co.*, 124 S.W.3d at 161–162 (stating "we may neither rewrite the parties' contract nor add to its language"). Rather, we must enforce the operating agreements as written. *See Royal Indem. Co. v. Marshall*, 388 S.W.2d 176, 181 (Tex. 1965).

In the "Purchase and Sale Agreement" with other parties, under which the Assignor originally obtained the Working Interests, the Assignor agreed to the following terms:

On the Closing Date, ownership of all production attributable to the Properties conveyed to [Assignor/Eland] and all other attributes of ownership, including liabilities and obligations arising after the Effective Date or assumed hereunder, shall pass as of the Effective Date. [Assignor/Eland] shall assume all liability and obligation for acquiring and ensuring compliance with all permits, licenses, and other authorizations which are required under federal, state and local laws with respect to pollution or protection of the environment relating to the Properties....

[Assignor/Eland], as owner of the Properties acquired on the Closing Date, shall, by consummation of the transactions contemplated by this Agreement, obligate itself to assume and timely discharge all duties, obligations and liabilities of the owner of the Properties....

Both assignments by which the Assignor/Eland originally obtained the Working Interests state:

It is understood and agreed by the parties hereto that this Assignment is made subject to [the applicable offshore operating agreement] and [Assignor/Eland] agrees to assume and be liable for a proportionate part of the obligations created [by the applicable offshore operating agreement]....

The Assignor/Eland does not dispute that it assumed liability as a party under the operating agreements; however, it claims that these operating agreements do not create any contractual obligation for a former working-interest owner to reimburse the Operator for costs paid by the Operator after the former working-interest owner has assigned its entire interest to a third party. The language of each applicable offshore operating agreement is substantially similar regarding this issue. Both agreements contain the following language:

### DEFINITIONS

. . .

2.10 *Participating Interest.* The respective percentage of participation of each Party electing to participate in each of the operations conducted hereunder, including the production of Oil and Gas, based on ownership in the Lease.

. . .

8.1 *Basis of Charge to the Parties.* Operator shall pay all costs and each Party shall reimburse Operator in proportion to its Participating Interest.

. . .

8.6 *Unpaid Charges.* If any Party fails to pay the charges due hereunder within sixty (60) days after rendition of Operator's statement, the other Participating Parties shall, upon Operator's request, pay the unpaid amount in proportion to their interests. Each Party so paying its share of the unpaid amount shall be subrogated to Operator's security rights to the extent of such payment.

8.7 *Default.* If any Party does not pay its share of the charges when due, Operator may give such Party notice that unless payment is made within fifteen (15) days, such Party shall be in default. Any Party in default shall have no further access to the maps, records, data, interpretations, or other information obtained in connection with operations. A defaulting Party shall not be entitled to vote on any

matter until such time as said Party's payments are current. The voting interest of each non-defaulting Party shall be in the proportion its Participating Interest bears to the total non-defaulting Participating Interest. As to any operation approved during the time a Party is in default, such Party shall be deemed to be a Non-participating [sic] Party.

. . .

14.1 *Platform Salvage and Removal Costs.* When the Parties owning a platform mutually agree to dispose of such platform, it shall be disposed of by the Operator as approved by such Parties. The costs, risks, and net proceeds, if any, resulting from such disposition shall be shared by such Parties in proportion to their Participating Interests.

. . .

14.4 *Abandonment Operations Required by Governmental Authority.* Any well abandonment or platform removal required by governmental authority shall be accomplished by Operator with the costs, risks, and net proceeds, if any, to be shared by the Parties owning such well or platform in proportion to their Participating Interests.

. . .

15.1 *Withdrawal.* A Party may withdraw from this Agreement as to a Lease by assigning, to the other Parties who do not desire to withdraw, all its interest in such Lease and the wells, platforms and Facilities used in operations on such Lease. . . . The assignees, in proportion to the respective interests so acquired, shall pay the assignor for its interest in the wells, platforms and Facilities, the current salvage value thereof less its share of the estimated current cost of

salvaging same, plugging and abandoning of wells, and removal of all platforms and Facilities, as determined by the Parties. In the event such withdrawing Party's interest in such salvage value is less than such Party's share of the estimated costs, the withdrawing Party shall pay the Operator, for benefit of the non-withdrawing Parties, a sum equal to the deficiency.

. . .

23.1 *Applicable Law.* This Agreement shall be interpreted according to the laws of The State of Texas.

. . .

26.1 *Successors and Assigns.* This Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, successors, representatives and assigns and shall constitute a covenant running with the Lease. Each Party shall incorporate in any assignment of an interest in the Lease a provision that such assignment is subject to this Agreement.

The Operator and the Assignor both assert that, as to the issues relating to the Operator's contract claim, these operating agreements are unambiguous. We agree. After reviewing these agreements, we conclude that they are unambiguous regarding the issue before us because they are so worded that they can be given a certain and definite legal meaning or interpretation. *See American Manufacturers Mut. Ins. Co.,* 124 S.W.3d at 161–162. Therefore, we construe these agreements as a matter of law. *See id.*

■ For the Operator to succeed in its breach-of-contract claim against the Assignor, the operating agreements must impose an obligation on the Assignor to pay the Operator a share of the operator-incurred costs or expenses after the Assign-

or's assignment of the Working Interests. In its motion for partial summary judgment in the trial court and in its appellate brief in this court, the Operator insists that the Assignor has such an obligation; however, the Operator does not cite any language from the operating agreements that creates this alleged obligation.[1]

Section 8.1[2] states that the Operator will pay all costs initially and then be reimbursed by each party *"in proportion to its Participating Interest."*[3] Section 2.10 defines "Participating Interest" as each party's respective percentage of participation *"based on ownership in the Lease."* (emphasis added). After the Assignor assigned the Working Interests to the Assignee, the Assignor had no ownership in the Lease. Therefore, under the unambiguous language of these agreements, the Assignor had no Participating Interest at any time relevant to this dispute. Because the reimbursement obligation in Section 8.1 is based on each party's Participating Interest, at no material time did the Assignor have any obligation to repay the Operator under the unambiguous language of Section 8.1. Likewise, Sections 14.1 and 14.4 state that the costs, risks, and net proceeds described in those sections shall be shared by the parties based on their Participating Interests.

After reviewing the operating agreements, we find no provision that imposes any obligation on a former working-interest owner to pay or reimburse the Operator for costs or expenses incurred after that owner has assigned all of its working interest to another party. We must enforce the operating agreements as written; we cannot rewrite the relevant provisions or add to their language under the guise of interpretation. *See American Manufacturers Mut. Ins. Co.,* 124 S.W.3d at 161–162; *Royal Indem. Co.,* 388 S.W.2d at 181. Accordingly, we conclude that although the Assignor agreed to be bound by the operating agreements in question, the unambiguous language of these agreements does not require it to reimburse the Operator for costs or expenses incurred after the Assignor assigned the Working Interests to the Assignee. *See American Manufacturers Mut. Ins. Co.,* 124 S.W.3d at 161–162, (holding that unambiguous language of insurance contract did not impose obligation to compensate insured for "diminished market value").

Although it cites no case directly on point, the Operator advances the following arguments in support of its position on this issue:

(1) The Assignor remains liable for the costs in question under the operating agreements, even if the Assignee assumed this liability, because the parties to the operating agreement never agreed to release the Assignor from its obligations in this regard.

(2) Sections 14.1 and 14.4, cited by the Assignor, do not satisfy the requirements of Texas law for releasing an assignor from its obligations in this regard.

(3) Section 15.1 allows parties to withdraw from the operating agreements, but withdrawing parties still must pay

---

1. Likewise, the Operator's landman, Derold Maney, testified at trial that he could not point to any place in the operating agreements where it states that former working-interest owners must reimburse the Operator for a share of costs incurred after the owner assigned its interest.

2. In this opinion, each time we refer to a "Section," we refer to the language of the two operating agreements in question.

3. Emphasis added.

their share of future well-abandonment and platform-dismantling costs.

(4) To adopt the Assignor's interpretation would allow a party to keep its working interest while the lease is productive and then assign the interest for minimal consideration to a financially insolvent company so as to avoid paying any amounts for plugging, abandonment, platform removal, and site clearance.

We do not find these arguments persuasive.

The first two arguments presume, contrary to the unambiguous language of the operating agreements, that a former working-interest owner has such a reimbursement obligation in the first place. The operating agreements impose none. Had the parties intended to create such an obligation, they easily could have included language to that effect in the operating agreements. They did not. The parties are bound by the agreements they have made, and we will not rewrite them.

As to the third argument, though Section 15.1 allows a party to withdraw, it does not require a party to withdraw rather than assign its interest. The operating agreements allow a party to assign its working interest without any requirement that the party first give other working-interest owners an opportunity to buy the interest on the same terms. *See, e.g., Tenneco, Inc. v. Enterprise Prods. Co.*, 925 S.W.2d 640, 644 (Tex.1996) (involving operating agreement that gave other owners preferential right to purchase before owner could sell to entity not a party to the operating agreement). Certainly, parties to operating agreements, especially agreements that limit reimbursement obligations to existing working-interest owners, might wish to bargain for preferential rights to purchase working interests or to impose restrictions on a party's ability to assign interests, for example, only to financially responsible parties or to parties that can provide additional security for the performance of their obligations. The parties made no such bargain in this case. We will not expand the contractual language to impose obligations not contained in the agreements.

The Operator's fourth argument fails because, while the wisdom of the contractual provisions the parties crafted and made part of the operating agreements might be questioned, that is not a matter for this court, which must enforce the agreements as written. *See American Manufacturers Mut. Ins. Co.*, 124 S.W.3d at 161–162; *Royal Indem. Co.*, 388 S.W.2d at 181. Because the question before us is not the wisdom of the agreements, but the clarity and completeness of their terms, once we find the contracts unambiguous, we must enforce them according to their terms.

## V. Conclusion

Because the unambiguous language of the operating agreements does not create the contractual duty that the Assignor allegedly breached, the Assignor had no breach-of-contract liability to the Operator as a matter of law. The trial court erred in finding it did and in granting summary judgment in favor of the Operator. Accordingly, we sustain Eland's first issue, reverse the part of the trial court's judgment that awards damages against Eland, and render judgment that Seagull take nothing against Eland.[4]

---

4. The Assignor raises four other issues on appeal; however, because we have sustained

its first issue, we need not address these is-    sues.