**SEAGULL ENERGY E & P, INC., Petitioner,**

v.

**ELAND ENERGY, INC., Respondent.**

No. 04–0662.

Supreme Court of Texas.

Argued Nov. 30, 2005.

Decided June 16, 2006.

Rehearing Denied Dec. 29, 2006.

William P. Maines, William J. Boyce, Fulbright & Jaworski L.L.P., Paul J. Franzetti, McDade Fogler, Houston, for petitioner.

Carl D. Rosenblum, John D. White, Jones Walker Waechter Poitevent Carrere & Denegre, The Woodlands, Alida C. Hainkel, Jones Walker Waechter Poitevent Carrere & Denegre, New Orleans, LA, J.D. Page, Doyle Restrepo Harwin & Robbins, Houston, for respondent.

Justice MEDINA delivered the opinion of the Court.

█ In this case we must determine whether the sale of an oil and gas working interest, which was subject to an operating agreement,[1] released the seller from any further obligations to the operator. The court of appeals concluded that it did, reversing the trial court's judgment in favor of the operator. 135 S.W.3d 122. We conclude that, despite selling its working interest, the seller remains liable under the operating agreement, unless released by the operator or the terms of the agreement. Because neither the operating agreement nor the operator expressly released the seller from its obligations under that agreement, we reverse the court of appeals' judgment and render judgment for the operator.

Seagull Energy E & P, Inc. is a lessee and operator of two offshore oil and gas leases in the Gulf of Mexico near the Texas coast—Blocks 828 and 831, Mustang Island Area. In 1994, Eland Energy, Inc. purchased an interest in both leases, acquiring a 1.09375% interest in Block 828 from General Atlantic Resources, Inc. and a 9.41719% interest in Block 831 from UMC Petroleum Corporation. As the new owner, Eland expressly assumed certain rights and responsibilities under two offshore operating agreements, each applicable to its respective block. Both agreements designated Seagull as the operator and were essentially the same. They provided that Eland and the other lessees were to share the cost of operations in proportion to their respective interests, and that Seagull, as operator, was to exploit the minerals and collect the operating costs from the other lessees.

In July 1996, Eland sold its interest in these leases to Nor–Tex Gas Corporation, also assigning to Nor–Tex its rights and obligations under the operating agreements. Not long thereafter, Nor–Tex failed to reimburse Seagull for its share of operating costs, and Seagull sought these costs from Eland as an interest owner. Eland, however, refused to pay because it no longer owned an interest in the leases.

Seagull then sued Eland and Nor–Tex for breach of the operating agreement. Both Seagull and Eland moved for summary judgment. The trial court denied Eland's motion but granted a partial summary judgment in Seagull's favor. In its summary judgment, the court concluded that Nor–Tex had breached the operating agreement by failing to pay its share of the operating expenses and that Eland also remained liable for these expenses which it incurred under the operating agreement. Damages were tried to the court which found Eland and Nor–Tex jointly and severally liable to Seagull in the amount of $268,418.90, plus interest and attorney's fees. Eland appealed.

The court of appeals reversed the trial court's judgment to the extent it awarded damages against Eland. The court concluded that Eland had no continuing liability under the operating agreements after

---

1. An operating agreement is a contract typical to the oil and gas industry whose function is to designate an "operator, describe the scope of the operator's authority, provide for the allocation of costs and production among the parties to the agreement, and provide for recourse among the parties if one or more default in their obligations." 3 Ernest E. Smith & Jacqueline L. Weaver, Texas Law of Oil and Gas § 17.3 at 17–7 (2d ed. 2006).

the assignment of its working interest because the agreements did not expressly provide for such a continuing obligation. 135 S.W.3d at 127–28.

Seagull argues, however, that Texas contract law generally provides that an assignor's contractual obligations survive assignment unless the contract expressly provides otherwise or the assignor obtains an express release. Because the operating agreements here were silent on the subject and they did not expressly release Eland, Seagull submits that the court of appeals should have applied this general rule. Eland responds that the court of appeals was right to ignore this rule of continuing liability because the express language of the operating agreements indicated that the rule did not apply. Eland maintains that its obligation to pay expenses under the operating agreement terminated on the date it sold its interests because the agreement imposed liability for expenses only upon current working interest owners.

■■■ This dispute thus turns on whether the parties to the operating agreement expressly agreed upon the consequences that should follow an assignment of one's interest to a third party. Although Seagull and Eland construe their obligations under this contract quite differently, a contract is not ambiguous merely because the parties disagree on its meaning. *Sun Oil Co. (Delaware) v. Madeley,* 626 S.W.2d 726, 727 (Tex.1981). "An ambiguity exists only if the contract language is susceptible to two or more reasonable interpretations." *Am. Mfrs. Mut. Ins. Co. v. Schaefer,* 124 S.W.3d 154, 157 (Tex. 2003). Neither the parties nor the lower courts have found this operating agreement ambiguous, and we likewise agree that it is not. Its meaning is therefore a question of law. *Coker v. Coker,* 650 S.W.2d 391, 394 (Tex.1983).

■■■ Our primary concern when interpreting a contract is to ascertain and give effect to the intent of the parties as that intent is expressed in the contract. *Gulf Ins. Co. v. Burns Motors, Inc.* 22 S.W.3d 417, 423 (Tex.2000); *Ideal Lease Serv., Inc. v. Amoco Prod. Co.,* 662 S.W.2d 951, 953 (Tex.1983). To discern this intent, we "examine and consider *the entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless. No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *Coker,* 650 S.W.2d at 393 (emphasis in original) (citations omitted).

Eland focuses on several provisions that connect its obligation to reimburse the operator for costs and expenses to its participating interest, which is in turn based on its ownership in the lease. The pertinent provisions define participating interest and allocate costs and expenses in proportion to these interests as follows:

Article 2
Definitions

\* \* \*

2.10 *Participating Interest.* The respective percentage of participation of each Party electing to participate in each of the operations conducted hereunder, including the production of Oil and Gas, based on ownership in the Lease.

\* \* \*

Article 8
*Expenditures*

8.1 *Basis of Charge to the Parties.* Operator shall pay all costs and each Party shall reimburse Operator in proportion to its Participating Interest.

\* \* \*

Article 14
*Abandonment and Salvage*

**14.1** *Platform Salvage and Removal Costs.* When the Parties owning a platform mutually agree to dispose of such platform, it shall be disposed of by the Operator as approved by such Parties. The costs, risks, and net proceeds, if any, resulting from such disposition shall be shared by such Parties in proportion to their Participating Interests.

\* \* \*

**14.4** *Abandonment Operations Required by Governmental Authority.* Any well abandonment or platform removal required by governmental authority shall be accomplished by Operator with the costs, risks, and net proceeds, if any, to be shared by the Parties owning such well or platform in proportion to their Participating Interests.

Eland concludes from these provisions that its obligation to reimburse the operator continued only so long as it owned a participating interest. Once it assigned its interest, it was, according to Eland's interpretation, released from any continuing obligation to the operator for future costs or expenses.

Eland, however, reads far too much into these provisions. Nowhere do they mention the subject of release or the consequences which are to follow the assignment of a working interest. These subjects are, however, mentioned elsewhere in the agreement.

For example, section 15.1, entitled "Withdrawal," [2] permits a party to withdraw from the agreement by assigning its interest to the other parties, while section 14.3, entitled "Assignment of Interest," [3] provides that a party desiring to abandon a well shall assign its interest to the non-abandoning parties. Moreover, Article 26 pertains generally to the subject of assignment, providing that the "[a]greement shall be binding upon and inure to the benefit of the parties and their respective heirs, successors, representatives and assigns" and providing further that any assignment be made subject to the operating agreement. But like the cost allocation provisions on which Eland relies, none of these provisions deals specifically with the present circumstances. The operating agreement simply does not explain the consequences of an assignment of a working interest to a third party. Thus, we disagree with Eland that the parties expressly agreed that an assignment of a working interest was to operate as a novation, effectively ending any further obligation of the assignor under the operating agreement.

■■■ Generally speaking, a party cannot escape its obligations under a contract merely by assigning the contract to a third

---

**2.** 15.1 *Withdrawal.* A Party may withdraw from this Agreement as to a Lease by assigning, to the other Parties who do not desire to withdraw, all its interest in such Lease and the wells, platforms and Facilities used in operations on such Lease. . . . Providing all such expenses, including any deficiency hereunder, due from the withdrawing Party have been paid within thirty (30) days after the rendering of such final payment, the assignment shall be effective the first day of the month following its receipt, and, the withdrawing Party shall thereafter be relieved from all further obligations and liabilities with respect to such Lease.

**3.** 14.3 *Assignment of Interest.* Each Participating Party desiring to abandon a well pursuant to Section 14.2 shall assign effective as of the last applicable election date, to the nonabandoning Parties, in proportion to their Participating Interests, its interest in such well and the equipment therein and its ownership in the production from such well. Any Party so assigning shall be relieved from any further liability with respect to said well.

party. *Farah v. Mafrige & Kormanik, P.C.,* 927 S.W.2d 663, 677 (Tex.App.-Houston [1st Dist.] 1996, no writ); *Univ. of Tex. Med. Branch at Galveston v. Allan,* 777 S.W.2d 450, 453 (Tex.App.-Houston [14th Dist.] 1989, no writ). Thus, as a general rule, a party who assigns its contractual rights and duties to a third party remains liable unless expressly or impliedly released by the other party to the contract. *See W. Oil Sales Corp. v. Bliss & Wetherbee,* 299 S.W. 637, 638 (Tex. Comm'n App. 1927, judgm't adopted); *Cauble v. Hanson,* 249 S.W. 175, 178 (Tex. Comm'n App.1923, judgm't adopted); *see also* 29 RICHARD A. LORD, WILLISTON ON CONTRACTS § 74.30, at 436–38 (4th ed. 2003). The principle is similarly recognized by statute and the *Restatement. See* TEX. BUS. & COM. CODE § 2.210(a) ("No delegation of performance relieves the party delegating of any duty to perform or any liability for breach."); RESTATEMENT (SECOND) OF CONTRACTS § 318(3) (unless the obligee agrees to delegation of performance, the delegation does not effect a discharge of the delegating obligor).

Even when the contract does not expressly provide for the consequences resulting from the assignment of one's interest, the contract's subject or other circumstances may indicate that obligations were not intended to survive assignment. For example, the *Restatement of Property* provides that "[w]hether a promise respecting the use of land of the promisor will continue to bind the promisor after he has ceased to have an interest in the land with respect to which the promise was made depends upon the intention manifested in the making of the promise." RESTATEMENT OF PROP.: SERVITUDES § 538. The comment notes that "[s]uch promises are often of such a character that they can be satisfactorily performed only by the possessor of the land affected." *Id.* cmt. a. As an example, the *Restatement* suggests that a promise to maintain a dam on one's property to provide a certain water level for a neighbor would cease upon the conveyance of the land. *Id.* cmt. c, illus. 2. Eland does not argue that this contract's subject or circumstances imply that it should be released of its obligations after assignment. Even if it were to argue this, it is not apparent why Eland would not have been able to fulfill its obligations under the operating agreement even after the transfer of its interest in the underlying lease. *See id.* cmt. c, illus. 1.

Because the operating agreement did not expressly provide that Eland's obligations under the operating agreement should terminate upon assignment and Seagull did not expressly release Eland following the assignment of its working interest, we reverse the court of appeals' judgment and render judgment for Seagull as the trial court did.

Justice O'NEILL and Justice BRISTER did not participate in the decision.