DECISION. *Page 2 
{¶ 1} This appeal concerns the interpretation of four provisions contained in a prenuptial agreement executed between plaintiff-appellant Jody Pol and defendant-appellee Ray Miller. For the following reasons, we reverse the trial court's judgment in part and remand this case for further proceedings.
 Marriage and Divorce {¶ 2} Pol and Miller were married in Texas in September of 1995. Prior to the marriage, Pol and Miller executed a prenuptial agreement. In 1997, Pol filed for divorce, and she moved to Ohio with the parties' minor son. But she and Miller reconciled, and the petition for divorce was dismissed. Miller eventually moved to Ohio as well.
 {¶ 3} In 2000, another divorce petition was filed by Miller. But this petition was also dismissed without culminating in a divorce. In 2002, Pol again filed for divorce. This petition was not dismissed, and the parties' marriage was officially terminated in 2006.
 {¶ 4} During the final divorce proceedings, Pol and Miller did not contest the validity of the prenuptial agreement. But they did contest the interpretation and enforcement of four different provisions contained in the agreement. We discuss the individual provisions in detail later in this decision.
 {¶ 5} A domestic relations magistrate interpreted all the provisions at issue in favor of Miller and declined to enforce them. The trial court overruled Pol's objections and adopted the magistrate's decision on these issues. Pol now appeals, *Page 3 
and in four assignments of error she argues that the trial court erred in failing to enforce these four provisions contained in the prenuptial agreement.
 Texas Contract Law {¶ 6} The prenuptial agreement specified that Texas law governed interpretation and construction of the agreement, even if the parties should reside in a different domicile. Consequently, an explanation of Texas contract law is necessary.
 {¶ 7} The law in Texas is similar to that in Ohio. When interpreting a written contract, a court must "ascertain and give effect to the parties' intentions as expressed in the document."[1] But "the intent of a contract is not changed simply because the circumstances do not precisely match the scenarios anticipated by the contract."[2] The language contained in the contract should be accorded its plain and ordinary meaning unless the contract is ambiguous.[3]
 {¶ 8} "Whether a contract is ambiguous is a question of law for the court to decide."[4] A contract will be considered ambiguous when the language used is susceptible to more than one reasonable interpretation.[5] When making an ambiguity determination, we must consider the circumstances present when the parties entered into the contract, and "[i]f a contract * * * can be given a definite or certain legal meaning, then it is not ambiguous."[6] This court reviews de novo whether a contract is ambiguous.[7] *Page 4 
 Annual Payments {¶ 9} In her first assignment of error, Pol argues that the trial court erred in failing to enforce paragraph 8.02(a) of the prenuptial agreement.
 {¶ 10} Paragraph 8.02(a) concerned payments that Miller was obligated to make to Pol, in lieu of spousal support, as part of a property settlement. It provided that "[i]f the parties' marriage is dissolved by divorce or annulment by any court, wherever located, it is stipulated that if the divorce occurs at any time in the first year of marriage, Husband shall be liable to and pay to Wife $25,000. From and after the first anniversary of the parties' wedding, Husband shall be liable to and pay to Wife an amount calculated by multiplying $25,000 by the number of years, to a maximum of ten, that had elapsed prior to the date that either party is notified in writing * * * that the other party has filed for divorce. * * * The sum shall be due and payable on the date the decree dissolving the marriage is signed by the Court."
 {¶ 11} Pol argues that she was entitled to $150,000 under this provision. In Pol's opinion, she should have received $25,000 for each year that the parties were married, beginning in 1995 and concluding when she filed for divorce and notified Miller in 2002.
 {¶ 12} But Miller contends that his obligations under this provision were extinguished in 1997, when Pol first filed for divorce and notified him. Miller argues that the parties' subsequent reconciliation had no effect on his obligations, which he posits were terminated when one party was notified of a divorce filing, even if no divorce resulted. The trial court adopted Miller's interpretation, and concluded that Miller's obligations under this provision ceased when he was notified that Pol had filed for divorce in 1997.
 {¶ 13} The resolution of this assignment of error hinges on the effect of the interim divorce filings, and whether Miller's obligations could have been terminated *Page 5 
by notice of a filing that did not result in a divorce. We conclude that the language in paragraph 8.02(a) was unambiguous, and that it clearly provided that Miller's obligations ceased on the date that one party was notified that the other had filed a divorce petition thatultimately resulted in the dissolution of the parties' marriage.
 {¶ 14} Paragraph 8.02(a) began by stating that "[i]f the parties' marriage is dissolved by divorce or annulment * * *." The parties clearly intended that Miller's obligations were to cease only when one party was notified of a divorce filing that terminated the marriage. This paragraph did not contemplate or provide for a divorce filing that was subsequently dismissed.
 {¶ 15} As we have stated, Texas law provides that "the intent of a contract is not changed simply because the circumstances do not precisely match the scenarios anticipated by the contract."[8] The fact that both Pol and Miller filed and later dismissed divorce petitions did not change their intentions as expressed in the prenuptial agreement.
 {¶ 16} The interim divorce filings in 1997 and 2000 had no effect on the parties' obligations under paragraph 8.02(a). Only a filing that resulted in dissolution of the parties' marriage could have ended Miller's obligations under this paragraph.
 {¶ 17} The trial court erred in concluding that Miller's obligations were terminated in 1997. Pol was entitled to receive $25,000 for each year that the parties were married, until she served Miller with notice of divorce in 2002. Pol's first assignment of error is sustained. *Page 6 
 Legal Fees {¶ 18} In her second assignment of error, Pol argues that the trial court erred in failing to enforce paragraph 8.03 of the prenuptial agreement.
 {¶ 19} Paragraph 8.03, titled "Attorney's Fees on Divorce," explained when Miller was obligated to provide Pol with money for legal fees related to a potential divorce. It provided that "[i]n any divorce proceedings, child custody suit or other marital property action involving interpretation or enforcement of this Agreement, both Husband and Wife hereby agree that each shall pay his or her own attorney's fees incurred in such action. Notwithstanding the foregoing, if the marriage of the parties is terminated by divorce, and Wife * * * does not assert, directly or indirectly, that this Agreement * * * is invalid or should not be enforced with the terms of this Agreement, the Husband agrees to provide funds to Wife for attorney's fees incurred by Wife in connection with the divorce proceedings, in the amount of $10,000."
 {¶ 20} Pol argues that she was entitled to $10,000 for her legal fees, as provided by paragraph 8.03, because she had not contested the validity of the prenuptial agreement.
 {¶ 21} But Miller argues that he had already paid Pol an amount well over $10,000 to cover the legal fees that she had incurred after filing for divorce, and later withdrawing the petition, in 1997. Miller argues that paragraph 8.03 only required a one-time payment, and that he fulfilled his obligation under this paragraph in 1999. The trial court concluded that Miller's payments to Pol in 1999 satisfied the requirements contained in paragraph 8.03, and that Pol was not entitled to an additional $10,000 for her legal fees. We disagree.
 {¶ 22} Like paragraph 8.02(a), which we have already discussed, paragraph 8.03 also contained the requirement that the parties' marriage be terminated by a divorce. This paragraph was not ambiguous. If the parties' marriage was *Page 7 
terminated by divorce, and if Pol did not challenge the validity of the prenuptial agreement, Pol was entitled to $10,000 for her legal fees.
 {¶ 23} In this case, the parties' marriage was terminated by divorce in 2006. And Pol did not challenge the validity of the prenuptial agreement. Consequently, under paragraph 8.03, she was entitled to $10,000 for her legal fees. Whatever reason Miller had for reimbursing Pol for attorney's fees in 1999, which payment Pol still disputes, the payment could not have been mandated by paragraph 8.03 since the earlier filing did not terminate the marriage.
 {¶ 24} The trial court erred in not enforcing this provision. Pol's second assignment of error is sustained.
 Residency Payment Obligations {¶ 25} In her third assignment of error, Pol argues that the trial court erred in failing to enforce paragraph 3.06 of the prenuptial agreement.
 {¶ 26} This section of the agreement was titled "Waiver of Community Property Claims." Paragraph 3.06(b), the specific provision at issue, was titled "Husband's Residence," and it provided the following: "Husband owns real estate property commonly referred to as 12 Valley Forge, Houston, Texas 77024, which property is subject to a mortgage. The parties intend to initially reside in the Valley Forge Residence, and acknowledge that at some future time the residence may be sold and a different residence be acquired. Husband shall be responsible for and pay regular monthly payments on the mortgage existing as of the date of the agreement or any mortgage on any subsequent residence, all expenditures for improvements, and all payments of real estate, school, and ad valorem taxes. Notwithstanding the provisions of section 3.04, Wife shall be entitled to reimbursement from Husband's *Page 8 
separate estate for the principal reduction resulting from any payment made from her funds."
 {¶ 27} Sometime after moving to Ohio, Pol purchased a home in Cincinnati. Miller resided in Texas when Pol purchased the Cincinnati home. Pol argues that, under paragraph 3.06(b), she was entitled to reimbursement from Miller for all mortgage payments, taxes, and improvements that she had made on the Cincinnati home. But Miller argues that Pol purchased the Cincinnati home without consulting him, with her own separate funds. The trial court accepted Miller's argument and concluded that Pol was not entitled to reimbursement for any expenses that she had incurred regarding the Cincinnati home. We agree.
 {¶ 28} During a hearing before the domestic relations magistrate, Pol testified that she had purchased the home in Cincinnati with her own money, after she and Miller had completed most of the divorce proceedings resulting from the 1997 filing. She further testified that Miller resided in Texas when she purchased the home, and that she had not bought the home with the intention that Miller would reside in it with her.
 {¶ 29} The prenuptial agreement contemplated the parties' purchase of separate property. Paragraph 3.08, titled "Presumption of Separate Property," provided that "[a]ny property held in the individual name of either party will be presumed to be the separate property of that party."
 {¶ 30} The Cincinnati home was clearly Pol's separate property. Paragraph 3.06(b), which concerned community property, was not ambiguous, and it did not require Miller to reimburse Pol for expenses incurred for the Cincinnati home. The trial court did not err in failing to apply this provision to Pol's claims.
 {¶ 31} Pol's third assignment of error is overruled. *Page 9 
 Monthly Payments During Marriage {¶ 32} In her fourth assignment of error, Pol argues that the trial court erred in failing to enforce paragraph 4.05 of the prenuptial agreement.
 {¶ 33} Paragraph 4.05, titled "Payments from Husband to Wife During Marriage," provided that "Husband agrees that following their wedding Husband shall continue to pay to Wife, as her separate property, the sum of $1,000 per month. The obligation of Husband to Wife for these monthly payments shall terminate on the date either party is notified in writing, return receipt requested, that the other party has filed for divorce, or at Husband's retirement, whichever occurs first."
 {¶ 34} Pol argues that she was entitled to $1,000 for every month that the parties were married until she notified Miller that she had filed for divorce in 2002. But Miller argues that his obligations under this paragraph ceased when Pol notified him in 1997 that she had filed for divorce, even though the petition was later dismissed. Miller alternatively argues that, should we conclude that his obligations did not terminate upon being served with notification of the divorce proceedings in 1997, they ceased when he retired from his employment with American Express in 1998.
 {¶ 35} The trial court concluded that Miller's obligations were terminated when he was notified that Pol had filed for divorce in 1997. Again, we disagree.
 {¶ 36} Paragraph 4.05 provided for two possible termination dates of Miller's obligations: the date that one party was notified that the other had filed for divorce, or the date that Miller retired. Miller's obligations terminated on the earlier of these two dates.
 {¶ 37} We first determine when Miller's obligations would have terminated under the first possible date, i.e. when one party was notified that the other had filed for divorce. Because this paragraph was titled "Payments from Husband to Wife *Page 10 During Marriage," it is clear that the parties intended the monthly payments to continue throughout the course of their marriage. Even though Miller was notified that Pol had filed for divorce in 1997, the parties remained married because that petition for divorce was dismissed. If Miller's obligations were to have ceased in 1997, the intent of paragraph 4.05 would have been frustrated because Pol would not have received the obligatory payments during many months of the parties' marriage.
 {¶ 38} Paragraph 4.05 was not ambiguous; if the first possible termination date was utilized, it required that Miller pay Pol $1,000 for each month of the parties' marriage until one party was served with notice that the other had filed a petition for divorce that ultimately resulted in a termination of the marriage. Like the other provisions that we have discussed, paragraph 4.05 did not contemplate the effect of, or provide for, the filing of a divorce petition that was later dismissed. The dismissed filings did not change the parties' intent when they signed the prenuptial agreement.
 {¶ 39} We conclude that the interim divorce filings had no effect on Miller's obligations under this provision. If the first termination date was utilized, paragraph 4.05 unambiguously required Miller to pay Pol $1,000 for each month that the parties were married until he was served with notice that Pol had filed for divorce in 2002. Thus, the trial court erred in using the date that Miller was notified that Pol had filed for divorce in 1997 to end his obligations.
 {¶ 40} We now determine when Miller's obligations would have terminated under the second possible date, which was the date of his retirement.
 {¶ 41} The record indicates that Miller retired from American Express sometime in 1998. But it further reveals that he subsequently obtained different employment and is not currently retired. The prenuptial agreement did not contemplate or provide for this scenario, just as it did not provide for the effect of interim divorce filings. *Page 11 
 {¶ 42} But these unanticipated circumstances did not alter the intent of the parties when they entered into the prenuptial agreement. And it is clear that the agreement contemplated Miller's retirement from the employment that he was engaged in at the time the agreement was signed. Consequently, we conclude that, under the second termination date, Miller's obligations ceased when he retired from American Express in 1998.
 {¶ 43} Because Miller's obligations terminated on whichever date occurred first, we conclude that he was required to pay Pol $1,000 for each month of the parties' marriage until he retired from his employment with American Express in 1998. On remand, the trial court must determine the exact date of Miller's retirement and calculate the amount due accordingly.
 {¶ 44} Pol's fourth assignment of error is sustained.
 Conclusion {¶ 45} The trial court properly concluded that Pol was not entitled, under paragraph 3.06(b) of the prenuptial agreement, to reimbursement from Miller for expenses that she had incurred for the Cincinnati home.
 {¶ 46} But the trial court erred in failing to enforce paragraphs 8.02(a), 8.03, and 4.05 of the prenuptial agreement. Pol was entitled to $10,000 compensation for her legal fees. She was also entitled to receive $25,000 for each year that the parties were married, beginning in 1995 and terminating when she notified Miller that she had filed for divorce in 2002. And finally, Pol was due $1,000 for each month of the parties' marriage until Miller retired from American Express in 1998.
 {¶ 47} The trial court's judgment is reversed in part, and this case is remanded for the trial court to calculate the amount due to Pol in accordance with the terms of this decision. *Page 12 
Judgment reversed in part and cause remanded.
PAINTER, P.J., and WINKLER, J., concur.
RALPH WINKLER, retired, from the First Appellate District, sitting by assignment.
[1] Frost Natl. Bank v. L F Distribs. (Tex. 2005), 165 S.W.3d 310,311-312.
[2] SAS Inst., Inc. v. Breitenfeld (Tex. 2005), 167 S.W.3d 840,841.
[3] Friendswood Dev. Co. v. McDade + Co. (Tex. 1996), 926 S.W.2d 280,283.
[4] Id. at 282.
[5] Seagull Energy EP, Inc. v. Eland Energy, Inc. (Tex. 2006),207 S.W.3d 342, 345.
[6] Friendswood Dev. Co. v. McDade + Co., supra,926 S.W.2d at 282.
[7] See Barber v. Colorado Indep. School Dist. (Tex. 1995),901 S.W.2d 447, 450.
[8] SAS Inst., Inc. v. Breitenfeld, supra, 167 S.W.3d at 841. *Page 1