# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00072-CV

**CCE, Ltd. f/k/a CCE, Inc., Appellant**

**v.**

**Texas Department of Transportation, Appellee**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT
NO. D-1-GN-08-002868, HONORABLE SUZANNE COVINGTON, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

CCE, Ltd., formerly known as CCE, Inc., appeals a district court judgment affirming an order by the Texas Department of Transportation (TxDOT) denying CCE's claims for additional compensation under a road construction contract. In five issues, CCE complains that the order must be reversed under the substantial evidence standard of review because TxDOT committed errors of law and acted arbitrarily and capriciously in failing to follow contract provisions that, CCE asserts, shifted the costs in dispute to TxDOT rather than CCE. Concluding that the contract as a matter of law made CCE responsible for the costs in question, we will affirm the district court's judgment.

The underlying dispute relates to a 1999 contract TxDOT awarded to CCE to perform work on three existing farm-to-market roads in TxDOT's Lufkin District, including FM 3315, a two-lane road. The contract includes standard specifications contained in a 1,233-page book as well as special provisions, plans, change orders, and other items. The work required of

CCE, simply described, consisted of removing portions of the existing roadway surface, reworking its cementious base, and then building a new asphalt and aggregate surface. The contract provided that CCE could perform its work by closing one of FM 3315's two lanes at a time, except that—under a provision designated as item 502—"[a]t the close of work each day, all traffic lanes shall be open to traffic," and provided detailed plans and directives regarding the routing of traffic and appropriate signage. The contract further provides that "[t]he Engineer will act as referee in all questions arising under the terms of the contract between the parties thereto and his decisions shall be final and binding."

Although the record reflects that the "season" for applying asphalt is typically between March 1 and October 31, TxDOT's Lufkin District engineer consented to CCE doing this work in December 1999. CCE applied the first of what was to be two layers of asphalt to a lane of FM 3315 on December 14, 1999. During the ensuing days, however, portions of this asphalt layer stuck to cars traveling over it while the lane was open, exposing the cement base to traffic and still more damage. TxDOT directed CCE to repair the damage at CCE's expense. CCE did so, and eventually completed its work under the contract.

Following completion of the project, CCE sought over $600,000 in additional compensation for its repair of the damages to FM 3315 through TxDOT's informal claim resolution procedures. *See* Tex. Transp. Code Ann. § 201.112(a) (West Supp. 2010). Dissatisfied with the outcome of this process, CCE requested a formal contested-case hearing. *See id.* § 201.112(b) (West Supp. 2010). TxDOT referred the claim to the State Office of Administrative Hearings (SOAH). Before the ALJ, CCE contended that TxDOT was responsible for the repair cost because

2

it had specified the wrong type of asphalt for CCE to apply, that the Department's engineer should have stopped CCE from applying asphalt on December 14, that special provision 7.12 had shifted responsibility for road maintenance to TxDOT while the road was opened, and that the Department's engineer had departed from the plain language of the contract in a manner constituting gross error. Following the hearing, the ALJ prepared a proposal for decision rejecting each of CCE's theories. The ALJ failed to find or conclude that TxDOT was responsible for the repairs under special provision 7.12. Instead, it relied on a different provision, standard specification 316.4, which provides, in relevant part:

> The Contractor shall be responsible for the maintenance of each course until covered by the succeeding courses or until the work is accepted by the Engineer. All holes or failures in the surface shall be repaired by use of additional asphalt and aggregate.

The ALJ reasoned that CCE was "responsible for the maintenance" of the first asphalt layer "until covered by the succeeding courses or until the work is accepted by the Engineer," neither of which had occurred before the road was damaged. The ALJ further found that the engineer's failure to assume responsibility for the first layer of asphalt was not gross error and concluded that CCE had failed to prove its entitlement to additional compensation. The ALJ's proposed findings and conclusions were adopted by TxDOT's executive director. *See id.* § 201.112(c) (West Supp. 2010).

CCE then sought judicial review of TxDOT's order in the district court. *See id.* § 201.112(d) (West Supp. 2010). Concluding that the order withstood scrutiny under the Administrative Procedure Act's "substantial evidence" standard of review, *see* Tex. Gov't Code Ann. § 2001.174 (West 2008), the district court affirmed the order.

3

On appeal, CCE brings five issues that are each predicated on the contention that, as a matter of law, special provision 7.12 governed the parties' respective responsibilities during the evening hours when FM 3315 was open and shifted the cost of repairing damage occurring at that time to TxDOT.[1]  Special provision 7.12 provides, in relevant part:

Contractor's Responsibility for Work.  Until final written acceptance of the project by the Engineer, the contractor shall have the charge and care thereof and shall take every precaution against injury or damage to any part thereof by the action of the elements or from any other cause, whether arising from the execution or from the nonexecution of the work.

. . . .

Wherever in the opinion of the Engineer, any roadway or portion thereof is in suitable condition for travel, it shall be opened to traffic, as may be directed, and such opening shall not be held to be in any way the final acceptance of the roadway or any part of the provisions of the contract.  Where it is considered by the Engineers to be in the public interest and so ordered in writing by him, any substantially completed roadway or portion thereof may be opened to traffic as follows:

(1) When required by plans, job sequence or the approved traffic control plan, with the Department accepting responsibility for maintaining that portion of the roadway opened to traffic.

---

[1]  Specifically, CCE argues that (1) "TxDOT contractually accepted responsibility for damage to the roadway"; (2) "[t]he Executive Director's reliance on standard contract specification 316.4(3) to assign responsibility for potholes and other damage constituted an error of law requiring reversal"; (3) TxDOT's decision to apply an "unwritten rule to interpret the Parties' contract requiring CCE to repair portions of the roadway without compensation, damaged when open to traffic during construction, was arbitrary, capricious, outside the limits of the Parties' contract, and constituted gross error"; (4) the ALJ "erred in interpreting the Parties' contract to find CCE responsible for damage to CCE's work that occurred when the roadway was open to traffic during construction"; and (5) "CCE carried its burden of proof establishing TxDOT's liability under the contract for damage to CCE's work [when it was] opened to traffic in accordance with the Approved Traffic Control Plan."

4

(2) When work is suspended for a period of time at the convenience of the State, the Department will assume the responsibility for maintaining the entire roadway during the period of suspension; or

(3) When the roadway or portion thereof is opened to traffic during construction operations at the convenience of the State, the Department will assume responsibility for the maintenance of the traveled way and shoulders during the period in which it is opened to traffic.

CCE reasons that subparagraphs (1) and (3) of special provision 7.12 shifted maintenance responsibility for FM 3315 because the road had been opened while still under construction as "required by . . . the approved traffic control plan" and "at the convenience of the State." And this provision, CCE further asserts, trumps standard specification 316.4 (the provision making CCE "responsible for the maintenance of each course until covered by the succeeding courses or until the work is accepted by the Engineer") by virtue of standard provision 5.5, which provides the following directive regarding resolution of conflicts between contract provisions:

The specifications accompanying plans, special provisions and supplemental agreements or change orders are essential parts of the contract and a requirement occurring in one is as binding as though occurring in all. They are intended to be cooperative and to describe and provide for a complete work. In cases of disagreement, figured dimensions shall govern over scaled dimensions, plans shall govern over standard and special specifications, and special provisions shall govern over both standard and special specifications and plans.

Although the formal posture of this case is an appeal of a TxDOT order determining that its engineer did not commit "gross error" in denying CCE additional compensation,[2] to which

---

[2] *See Texas Dep't of Transp. v. Jones Bros. Dirt & Paving Contractors, Inc.*, 92 S.W.3d 477, 480 (Tex. 2002).

5

we apply the APA's "substantial evidence" standard, these inquiries here turn in the first instance on pure questions of law that we review de novo—namely, the proper construction and application of the parties' contract to undisputed facts. *Cities of Abilene v. Public Util. Comm'n*, 146 S.W.3d 742, 747-48 (Tex. App.—Austin 2004, no pet.). Our primary objective in construing a written contract is to ascertain and give effect to the intentions the parties have objectively manifested in the written instrument. *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 311-12 (Tex. 2005). Contract terms are given their plain, ordinary, and generally accepted meanings, and we construe the contract as a whole in an effort to harmonize and give effect to all of its provisions so that none will be rendered meaningless. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005). If a contract is unambiguous—it can be given a certain or definite legal meaning or interpretation—it is construed as a matter of law. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).

We conclude that special provision 7.12 is not ambiguous and does not conflict with standard specification 316.4 on this record. Standard specification 316.4 provides the default allocation of responsibility for maintenance of the roadway under construction: the contractor is responsible for maintenance of each course until it is covered or until the work is accepted by the engineer. Item 502 provides the default traffic control plan: although one lane of the road may be closed while work is being done, all traffic lanes shall be open to traffic at the close of work each day. Special provision 7.12 provides terms under which these conditions may be altered. When the engineer considers that opening the substantially completed roadway or portion thereof is in the public interest and it is "so ordered in writing by him," the road may be opened as required by plans, job sequence, approved traffic control plan, or the convenience of the State. In those circumstances,

6

responsibility for maintenance shifts to the State. These contract provisions do not conflict. The standard provision controls unless the conditions of the special provision are satisfied. Collectively, the terms describe the parties' agreement that—with the roadway opened to traffic after the close of work each day—the contractor would be responsible for maintaining each course of pavement until it was covered by another course of pavement or the engineer accepted the work, or until the engineer ordered in writing that the roadway be opened to traffic under specified conditions.

CCE contends that the State was responsible for maintaining the road because the road was open pursuant to the project's plans, sequence, and traffic control plan. CCE describes this plan as "the Engineer's sealed writings." This appears to be an attempt to show satisfaction of the requirement in special provision 7.12 that the road be opened pursuant to the engineer's written order. In the contract document, both item 502 (requiring that the road be entirely open after work) and special provision 7.12 (setting out road-opening conditions under which maintenance responsibility shifts) follow the engineer's certification that "[t]he enclosed Texas Department of Transportation specifications, special provisions, general notes, and specification in this document have been selected by me, or under my responsible supervision, as being applicable to this project(s)." That certification and the ensuing 118 pages of related documents are themselves followed by the concluding paragraphs and signature page of the contract. The conclusion section describes the document as an "agreement." Item 502 is not a written order of the engineer that the road be open to traffic. It is an agreement between the parties that the road will be open to traffic after the close of work each day. Item 502 does not, as a matter of law, satisfy the requirement of special provision 7.12 that the road be open pursuant to the engineer's written order. If it did, the

7

contract's requirement of a written order opening the roads to trigger application of special provision 7.12 would be superfluous. We decline to interpret the parties' agreement in a way that renders a provision meaningless. *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006) ("[W]e 'examine and consider *the entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless.'" (quoting *Coker*, 650 S.W.2d at 394) (emphases in original)). CCE has not shown any error in the decisions below that are consistent with this view of the contract.

As the requirements of special provision 7.12 are not met, responsibility for maintenance is governed by standard specification 316.4. This determination resolves the issues CCE presents on appeal. We affirm the district court's judgment affirming TxDOT's order.

_____

Bob Pemberton, Justice

Before Justices Pemberton, Henson and Goodwin

Affirmed

Filed: March 2, 2011

8