

# IN THE
# TENTH COURT OF APPEALS

### No. 10-09-00004-CV

**DR. LINDA C. HAYNES,**

                                          **Appellant**

 **v.**

**BAYLOR UNIVERSITY,**

                                          **Appellee**

---

**From the 414th District Court**
**McLennan County, Texas**
**Trial Court No. 2004-1888-5**

---

## MEMORANDUM OPINION

---

Dr. Linda C. Haynes appeals the trial court's summary judgments in favor of Baylor University. We will affirm.

Dr. Haynes brought suit against Baylor, alleging in pertinent part: In 1992, Dr. Haynes became employed by Baylor University School of Nursing as a clinical faculty member, non-tenure track. In 1997, she was promoted to a tenure-track Assistant Professor position. In accordance with Baylor's policies and procedures governing tenure, she was evaluated by all tenured faculty of the nursing school each academic

year beginning in the 1997-98 academic year. Each year she was recommended for continued employment as a tenure-track professor. In the fall of 2002, Dr. Haynes submitted her application to become a fully tenured faculty member, but she was denied tenure and received a one-year terminal contract for the 2003-04 academic year. Dr. Haynes's employment with Baylor terminated at the end of the spring semester in 2004.

Immediately after she was notified that she had been denied tenure at Baylor, Dr. Haynes initiated an administrative appeals process with the university, but she received no satisfactory explanation for her tenure denial. Thus, she brought this suit against Baylor. After filing suit, she learned that she had been recommended for tenure by the majority of the tenured faculty of the School of Nursing, by the Dean of the School of Nursing, and by the majority of the members of the University Tenure Committee, but that tenure was nevertheless denied by Baylor administrators. She also learned that an individual who was not recommended for tenure by her tenured faculty peers, by her Dean, or by the majority of the members of the University Tenure Committee was granted tenure by Baylor administrators. Dr. Haynes further learned that non-tenure-track faculty delivered negative letters directly to Baylor administrators at or about the time that the University Tenure Committee was considering her application for tenure. The letters included information that was "provably false and misleading."

Dr. Haynes alleged a cause of action for breach of contract, among others, against Baylor. Specifically, Dr. Haynes alleged that Baylor breached its Personnel Policies and Procedures relating to the granting and/or denial of tenure by (1) allowing non-tenured

faculty to provide information directly to administrators relating to the award or denial of tenure to a tenure candidate; and (2) allowing for tenure decisions that are made as a result of arbitrary and capricious actions, to-wit: (a) denying tenure to a tenure-track faculty member on the basis of information furnished by non-tenure-track faculty directed only to the attention of Baylor administrators; and (b) granting tenure to a tenure-track faculty member when tenured faculty within the candidates' department, the Dean, and the University Tenure Committee opposed the granting of tenure and the decision was made solely by the Baylor administrators.

Baylor filed traditional and no-evidence motions for summary judgment. The trial court granted both motions without specifying the grounds.

In her sole issue, Dr. Haynes contends that the trial court erred in granting summary judgment for Baylor on her breach of contract claims.[1]

We review a trial court's summary judgment de novo. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). A no-evidence motion for summary judgment is essentially a motion for pretrial directed verdict. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 581 (Tex. 2006); *see also Humphrey v. Pelican Isle Owners Ass'n*, 238 S.W.3d 811, 813 (Tex. App.—Waco 2007, no pet.). Once such a motion is filed, the burden shifts to the nonmoving party to present evidence raising an issue of material fact as to the elements specified in the motion. *Tamez*, 206 S.W.3d at 583. The nonmovant must produce "summary judgment evidence raising a genuine issue of

---

[1] Dr. Haynes has not raised any issues as to whether the trial court erred in granting summary judgment for Baylor on her other causes of action.

material fact." TEX. R. CIV. P. 166a(i); *see id.* Comment 1997 ("To defeat a motion made under paragraph (i), the respondent is not required to marshal its proof; its response need only point out evidence that raises a fact issue on the challenged elements."). A genuine issue of material fact exists if more than a scintilla of evidence establishing the existence of the challenged element is produced. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Id.* (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). On the other hand, the evidence amounts to no more than a scintilla if it is "so weak as to do no more than create a mere surmise or suspicion" of fact. *Id.* When determining if more than a scintilla of evidence has been produced, the evidence must be viewed in the light most favorable to the nonmovant. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004).

In reviewing a traditional motion for summary judgment, we must consider whether reasonable and fair-minded jurors could differ in their conclusions in light of all of the evidence presented. *See Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007). We must consider all the evidence in the light most favorable to the nonmovant, indulging every reasonable inference in favor of the nonmovant and resolving any doubts against the motion. *See id.* at 756.

When a successful summary judgment movant presents both traditional and no-evidence grounds, we must uphold the summary judgment if it can be sustained under

either method. *Bradford Partners II, L.P. v. Fahning*, 231 S.W.3d 513, 517 (Tex. App.—Dallas 2007, no pet.).

Dr. Haynes's revised letter of appointment to the faculty of Baylor for the Fall 2002 and Spring 2003 semesters, which was signed by Dr. Haynes and Baylor's President, stated that her employment contract with Baylor consisted of the revised letter of appointment and the "applicable provisions of the Baylor University Personnel Policy Manual, which Baylor may change from time to time." *See Halper v. Univ. of the Incarnate Word*, 90 S.W.3d 842, 845 (Tex. App.—San Antonio 2002, no pet.) ("An unsigned paper may be incorporated by reference in a signed agreement."). Baylor's Personnel Policy Manual included a detailed policy dealing with tenure, entitled Tenure Policy and Procedures of Baylor University, BU-PP 704. It provided in pertinent part:

> III. Tenure Process
>
> The tenure process for tenure-track faculty not transferring prior research or teaching credit toward tenure is as follows. . . .
>
> . . . .
>
> C. Tenure Review
>
> Tenure will not be awarded by default; it is the responsibility of the tenure candidate to demonstrate conclusively why he/she should be given tenure at Baylor. If the tenure candidate fails to do so during the Tenure Review year, a terminal letter of appointment will be issued for the succeeding year. The sixth year of service at Baylor (or equivalent prior credit granted for employment at another institution and service at Baylor) is designated the Tenure Review year.
>
> The tenure-track faculty member, all available tenured departmental faculty, the departmental chairperson, the dean, and the University

Tenure Committee, the Provost and Vice President for Academic Affairs, and the President participate in the review process. The following are the responsibilities of each participant in this process:

. . . .

5. The responsibilities of the University Tenure Committee Chairperson are as follows:

> a. Secure a list of tenure candidates from the Assistant Provost for Academic Services at the beginning of the Fall semester.

> b. Secure from the deans a list of the tenured departmental faculty members from the deans to receive tenure evaluation forms.

> c. Send appropriate documents to the candidate and the tenured departmental faculty members.

> d. Monitor the return of acknowledgment forms, departmental faculty member evaluation forms, and receipt of credential notebooks.

> e. Arrange for and conduct meetings of the University Tenure Committee. Obtain appropriate additional information requested by the committee members. Make any personal contacts with the candidates as required to obtain additional information.

> f. Complete a summary report for each candidate and forward the Committee recommendations to the Provost and Vice President for Academic Affairs with a copy to each Tenure Committee member.

> g. Forward all tenure documents, including ballots, to the Assistant ProvostDean [sic] for Academic Services.

. . . .

7. The responsibilities of the Provost and Vice President for Academic Affairs are as follows:

> a. Review each case and make a recommendation to the President.

> b. Submit all relevant material and Tenure Committee recommendations to the President.

c. Report the President's decision regarding the granting or denial of tenure to the Chairperson of the Tenure Committee.

d. Report the President's decision regarding the granting or denial of tenure to the appropriate dean and departmental chairperson. After final tenure decisions have been made, the Provost and Vice President for Academic Affairs will communicate to each dean the tenure decision made for each faculty member within the dean's academic unit, and, in the case of successful tenure candidate(s), will provide the dean a summary of the conclusions reached during the review process regarding strengths and weaknesses of the candidate.

8. The responsibilities of the President are as follows:

a. Consult with the Provost and Vice President for Academic Affairs and make the final decision regarding the granting or denial of tenure. The decision of the President shall be final and binding.

b. Sign a letter to the candidate conveying this decision to be delivered as stated in III.C.4.d.

c. Report the decision to the Provost and Vice President for Academic Affairs.

. . . .

G. Implementation

. . . .

3. Additionally, The [sic] procedures contained in this policy describe the system for evaluating tenure-track faculty members as that system ideally should work. Each participant in the process should strive to meet his or her important responsibilities as outlined in this policy and should encourage other participants in the process to fulfill their responsibilities. Nonetheless, there will invariably be circumstances when participants in the process fail to fully and completely comply with their responsibilities under this policy. If such an error is promptly brought to the attention of the University prior to any final tenure decision through the Provost and Vice President for Academic Affairs, the University will make reasonable efforts to correct the error if practicable. However, recognizing that such

errors will invariably occur and that tenure should be awarded based on the merits of the candidate rather than the performance of participants in the process of evaluation, an error in complying with the requirements of this policy shall in no event justify the award of tenure and shall not provide the basis for any legal claim against the University or against participants in the process of evaluation.

One of Baylor's grounds for traditional summary judgment was that the procedural error alleged by Dr. Haynes in the tenure review process could not amount to a breach of contract because Section G.3. of the tenure policy states that an error in complying with the policy will not justify the award of tenure and shall not provide the basis for any legal claim against Baylor.

Our primary concern in interpreting the contract is to ascertain the true intentions of the parties as expressed in the instrument. *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006). If the written instrument is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous, and we will construe the contract as a matter of law. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). Terms are given their plain, ordinary, and generally accepted meaning, unless the instrument shows the parties used them in a technical or different sense. *Heritage Res., Inc. v. Nations Bank*, 939 S.W.2d 118, 121 (Tex. 1996). We must examine and consider the entire writing in an effort to harmonize and give effect to all provisions so that none are rendered meaningless. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). To the extent of any conflict, specific provisions control over more general ones. *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133-34 (Tex. 1994).

We conclude that, based on the unambiguous language of Section G.3. of the tenure policy in this case, the error alleged by Dr. Haynes in the tenure review process could not provide the basis for a breach of contract claim against Baylor. Thus, the trial court did not err in granting summary judgment for Baylor on Dr. Haynes's breach of contract claims because Baylor met its burden of establishing that it was entitled to judgment as a matter of law. *See* TEX. R. CIV. PROC. 166a(c); *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002); *see also Halper*, 90 S.W.3d at 845-47 (upholding summary judgment in favor of university because evidence conclusively established that university did not breach Faculty Handbook requirements with regard to procedures to be followed in making tenure decision).

We overrule Dr. Haynes's sole issue and affirm the trial court's judgments.


                          REX D. DAVIS
                          Justice

Before Chief Justice Gray,
      Justice Reyna, and
      Justice Davis
Affirmed
Opinion delivered and filed December 22, 2010
[CV06]