**Reversed and Remanded and Opinion filed April 25, 2013.**



**In The**

**Fourteenth Court of Appeals**

### NO. 14-11-00908-CV

## INDIAN OIL COMPANY, LLC AND WILLIAM E. TROTTER, II, Appellants

### V.

### BISHOP PETROLEUM INC., Appellee

**On Appeal from 164th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2009-34720**

### O P I N I O N

William E. Trotter, II appeals a judgment in favor of Bishop Petroleum Inc. in this contract dispute.[1]  We reverse and remand.

---

[1] Appellant Indian Oil Company, LLC moved to dismiss its appeal in this case on December 12, 2012, and asked this court to dismiss it as a party.  The motion was carried with the case.  We grant Indian Oil Company's motion and dismiss it as a party in this appeal.

## Background

Robert Harry Bishop owns and operates Bishop Petroleum, which has been engaged in the oil and gas business since 1976. Bishop Petroleum started exploring and producing oil and gas in Escambia County, Alabama in 1981. Because the formation in Escambia County contains lethal hydrogen sulfide, any operations in this formation require special care and compliance with numerous Alabama state regulations.

In 1992, Bishop Petroleum was the operator and a working interest owner under a joint operating agreement pertaining to a deep oil well called Scott Paper 27-1 in Escambia County. The governing document is an A.A.P.L. Form 610 – 1989 Model Form Operating Agreement. The well was drilled and continuously produced approximately 1.6 million barrels of oil and six billion cubic feet of gas from 1993 until 2007.

Trotter was a party to the joint operating agreement and one of several non-operator working interest owners. Trotter assigned his 8.5 percent working interest in the well in January 2002 to a company he founded called Indian Oil Company, LLC. Indian Oil informed Bishop Petroleum of Trotter's assignment by letter on July 15, 2002; thereafter, Bishop Petroleum distributed revenues and billed expenses to Indian Oil.

When the well ceased producing in February 2007, Harry Bishop met to discuss the problem with Bishop Petroleum's longtime consulting petroleum engineer Darnell Knippa. Knippa sent a Bishop Petroleum-approved memorandum to the working interest owners on March 12, 2007, in which he proposed a workover to clean out the well's tubing and casing; he attached an authority for expenditure, which the working interest owners approved. The March 2007 workover did not restore production. Subsequent gamma-ray tests

indicated anomalies and caused Knippa to suspect the presence of holes in the well's casing.

Knippa sent a Bishop Petroleum-approved memorandum to the working interest owners on April 30, 2007, in which he explained his proposed well workover operations and submitted an authority for expenditure (the "April AFE") in the amount of $1,116,600. The April AFE proposed to "run a caliper survey in the production tubing, utilize a workover rig to pull the production tubing, repair a leak in the casing and to replace the production tubing." It also proposed to conduct fishing operations to retrieve tubing, and to install lift mandrels for future artificial lift. Knippa's objective in proposing the workover in the April AFE included removing the tubing; pressure testing the casing and repairing any holes that were found; installing new tubing; and performing certain operations to address issues he anticipated would arise in the future.

Trotter, in his capacity as managing member of Indian Oil, and most of the other working interest owners consented to the April AFE. Three working interest owners holding 14.5% of the working interest in the well did not consent to the April AFE. Bishop Petroleum sent a letter to the consenting working interest owners on June 19, 2007, asking if they wished to take over the "proportionate share of the 14.5% interest that is non-consent." Bishop Petroleum and Trotter elected to participate and thereby increased their respective interests in the well. Trotter signed the election: "William E. Trotter."

The April AFE expired under the joint operating agreement before any proposed operations were started because Bishop Petroleum could not find a suitable workover rig for the well. Knippa and Harry Bishop then discussed proposing a scaled-down workover. Knippa sent a Bishop Petroleum-approved memorandum to the working interest owners on July 23, 2007, in which he

3

explained his proposed workover operations and submitted an authority for expenditure (the "July AFE") in the amount of $589,800. The July AFE proposed to pull out free production tubing and replace it with new production tubing "in order to return the well to production." Knippa did not propose fishing for tubing because he wanted to cut only free tubing. He proposed pressure testing the casing integrity to determine if a hole or leak was present; cleaning out the well; and getting the well back on production before suggesting additional work.

Trotter, in his capacity as managing member of Indian Oil, and other working interest owners consented to the July AFE in August 2007. Workover operations started on October 1, 2007. A free point indicator tool got stuck in the well on the second day; fishing operations to retrieve the tool lasted about 18 days. Coil tubing operations expected to take two days lasted 31 days. Bishop Petroleum pressure tested the casing for holes. According to Knippa, the pressure tests did not reveal a hole in the casing. Bishop Petroleum abandoned the workover efforts in January 2008 after the well's production zone could not be reached. Bishop Petroleum decided not to plug the well at the time because it hoped the well would clean itself and increase production over time. Bishop Petroleum spent approximately $1.6 million on the workover.

When the well did not increase productivity, Knippa proposed to plug and abandon the well; he submitted an authority for expenditure to the working interest owners on January 27, 2009, in the amount of $243,300 for the cost of plugging and abandonment. A hole in the casing was discovered when the well was plugged in June 2009.

Bishop Petroleum asked the working interest owners to pay their share for the cost of the workover, and for the cost for plugging and abandonment the well. Bishop Petroleum later sent a demand letter to the working interest owners who

4

had not made payments, requesting payment for "indebtedness incurred under the operating agreement." Most of the working interest owners made payments; Trotter and Indian Oil, among others, did not pay.

Bishop Petroleum sued Indian Oil and four other working interest owners on June 2, 2009, for breach of contract, quantum meruit, and unjust enrichment. Bishop Petroleum alleged that the defendants refused to pay their proportionate share of expenses resulting from the reworking operations and plugging and abandoning the well; it later added Trotter individually as a defendant in the suit.

The defendants filed a counterclaim for breach of contract, among other claims, on June 24, 2010. The defendants alleged, among other things, that Bishop Petroleum breached the joint operating agreement by (1) failing to report a casing hole to the Alabama Oil and Gas Board and failing to submit a repair proposal; (2) proposing the July AFE when the well had tubing and casing holes and was close to being depleted; (3) hiding necessary fishing operations; and (4) failing to inform the defendants of the workover progress and costs.

A jury trial was held from May 9 to May 17, 2011. As pertinent to this case, the jury (1) answered "No" to a question asking whether Bishop Petroleum failed to comply with the Joint Operating Agreement; (2) found that Trotter individually and four other defendants had an obligation to pay Bishop Petroleum a "prorated share of expenses per the Joint Operating Agreement," and that his obligation to perform was not excused; and (3) awarded damages in the amount of $336,393.42 to compensate Bishop Petroleum for Trotter's breach of the joint operating agreement. The jury charge did not submit any questions as to Indian Oil.

Trotter filed a motion for judgment notwithstanding the verdict on June 27, 2011; the trial court did not rule on the motion. The trial court signed a judgment on July 15, 2011, which ordered that (1) Trotter pay Bishop Petroleum

5

$336,393.42 in damages, $79,176.67 in attorneys' fees, and $32,673.09 for litigation expenses; and (2) Trotter take nothing on his counterclaims against Bishop Petroleum. Trotter filed a motion for new trial on August 11, 2011; the trial court did not rule on the motion. Trotter filed a timely notice of appeal on October 13, 2011.

## Analysis

### I. Legality

In his first issue, Trotter contends that the trial court should have rendered a take-nothing judgment in his favor because "an agreement that cannot be legally performed is void, and the July AFE workover could not have been legally performed." Trotter contends that Bishop Petroleum's July AFE was void and violated public policy because the proposed work could not have been performed without violating Alabama law. According to Trotter, Alabama Oil and Gas Board rules and regulations prevent a party from producing a well that has a hole in the casing. Trotter argues the workover could not have been legally performed because the July AFE proposed a workover on a well that had a hole in the casing without also proposing a plan to repair the hole.

A contract to do an act which cannot be performed without violation of the law violates public policy and is void. *Denson v. Dallas Cnty. Credit Union*, 262 S.W.3d 846, 852 (Tex. App.—Dallas 2008, no pet.); *In re Kasschau*, 11 S.W.3d 305, 312 (Tex. App.—Houston [14th Dist.]1999, no pet.). The purpose behind this rule is not to protect or punish either party to the contract, but to benefit and protect the public. *Denson*, 262 S.W.3d at 852; *Kasschau*, 11 S.W.3d at 312. A contract that could have been performed in a legal manner will not be declared void because it may have been performed in an illegal manner; in examining an agreement to determine if it is contrary to public policy, the court must look for a

6

tendency to be injurious to the public good. *Tex. A & M Univ.-Kingsville v. Lawson*, 127 S.W.3d 866, 873 (Tex. App.—Austin 2004, pet. denied).

It is debatable whether Trotter preserved this argument below. He did not argue in the trial court that the July AFE was void or that it violated public policy. In his motion for judgment notwithstanding the verdict and his motion for new trial, Trotter argued that (1) a well cannot be legally produced with a hole in the casing under Alabama law; and (2) a hole in the casing "must be reported to the Alabama Oil and Gas Board, which was not done," and this "failure to report is a breach of the Operating Agreement as a matter of law."

In any event, this argument fails on the merits even if Trotter's post trial motions are construed generously to argue (as he does on appeal) that the evidence conclusively establishes illegality as a matter of law. We reject this contention because Trotter improperly assumes there was a hole in the casing at the time of the July AFE. This assumption is improper because the evidence in that regard was disputed at trial.

Trotter points to memoranda accompanying the April and July AFEs, which state that operations in April 2007 "determined that there is a hole in the tubing and the casing." He also points to the schematic diagrams submitted with the April and July AFEs, which indicated "a possible hole in casing." Trotter states that his expert witness, Wayman Gore, testified that he believed a hole in the casing was found during the March workover. Trotter in particular points to the following exchanges between his attorney and Alabama Oil and Gas Board operations supervisor Ralph Hellmich:

> Q: Now, can you tell me what an operator is required to do when they discover the potential or possibility of a casing leak or a hole in the casing?

A: One of the primary safety issues with the State of Alabama is casing integrity. It's basically a given. If you look at our rules and regulations, it refers back to casing integrity, and anytime a well has lack of casing integrity, we ask the operator to remedy that situation.

      *       *       *

Q: But if, in fact, the well had had a hole in the casing, under your rules, they were not allowed to produce that well without fixing the hole?

A: This procedure would probably not have been approved. We would've asked them to address the casing leak.

      *       *       *

Q: Let me back up. In March of 2007, if a casing — if a potential casing leak was discovered, Bishop was required to devise a plan to determine whether there really was a casing leak, and if — if there was a casing leak, to notify your office and not attempt to produce the well until the casing leak was repaired?

A: If we would've been aware that there was a casing leak, we would've required corrective action, and they would've had to submit something to us to fix that.

Q: All right. And if you were aware that there was a possible casing leak —

A: Yes.

Q: — you would require them to determine whether it existed or not prior to doing any —

A: Yes. [2]

Hellmich's testimony establishes that (1) if there is a hole in the casing, then an operator must repair the hole; and (2) if the Alabama Oil and Gas Board is aware of a possible hole in the casing, then the Board requires an operator to determine whether a casing hole exists. Neither the above-cited testimony nor any other trial testimony by Hellmich conclusively establishes that there was in fact a casing hole

---

[2] The terms "leak" and "hole" are used synonymously by the parties in this case. The parties refer interchangeably to a "casing leak" and "hole in the casing."

at the time of the proposed workover operations under the July AFE.

The evidence at trial was contested regarding the existence of a hole in the casing at the time of the July AFE. Gore testified that he believed a hole had been discovered after the March workover, and the memoranda attached to the April and July AFEs stated that a casing hole had been discovered. But Harry Bishop and Knippa testified that they had not confirmed the presence of a hole at the time of the proposed April and July AFEs.

Harry Bishop testified that he and Knippa suspected a hole in the casing in the spring of 2007 based on a gamma-ray neutron log that showed anomalies. He testified that Bishop Petroleum performed several procedures in spring 2007 to determine whether there was a hole but could not do so without undertaking additional work. Harry Bishop stated that Bishop Petroleum put new tubing in the well and then pressure-tested the casing in October or November 2007; these pressure tests indicated that there was no hole in the casing.

Knippa testified that he suspected a hole in the tubing and casing because gamma-ray tests conducted in mid-April 2007 indicated anomalies on the log. Knippa testified that under the July AFE he proposed changing the free tubing in the well and then pressure testing the casing to confirm if there was a hole in the casing. He testified that he could not pressure test the casing with holes in the tubing. Knippa stated he was able to prove that there was no hole in the casing after pressure testing the casing on two separate days.

Knippa acknowledged writing in the April and July AFEs that a hole existed in the casing, but he testified that he should not have made the statement because he only suspected a hole in the casing and could never "prove it." Knippa also testified that if a hole in the casing had been found, he would have reported it to the Oil and Gas Board and asked the Board how to proceed. Hellmich agreed that

9

"if Bishop Petroleum merely suspects a potential hole in the casing, then there's no reason to stop attempting to get a well to . . . produce."

Based on the record before us, the evidence is disputed as to whether there was a hole in the casing at the time of the proposed July AFE. Trotter improperly assumes that there was a hole in the casing that required a proposal for casing repair. We therefore reject Trotter's argument that, as a matter of law, the workover proposed in the July AFE could not have been legally performed because there was a hole in the casing and the AFE did not provide for a plan to repair the hole.

Accordingly, we overrule Trotter's first issue.

## II.  Legal Sufficiency

In his second issue, Trotter contends there is no evidence to support the jury's "No" answer to Question No. 3 asking whether Bishop Petroleum failed to comply with the joint operating agreement. He contends Bishop Petroleum breached the joint operating agreement as a matter of law in at least three ways.

When conducting a legal sufficiency review, we view the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We credit evidence favorable to the verdict if reasonable factfinders could and disregard contrary evidence unless reasonable factfinders could not. *Id*. at 827.

When an appellant challenges the legal sufficiency of an adverse finding on an issue for which the appellant had the burden of proof, the appellant must demonstrate that the evidence conclusively establishes all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001); *TH Invs., Inc. v. Kirby Inland Marine, L.P.*, 218 S.W.3d 173, 189 (Tex. App.—Houston

10

[14th Dist.] 2007, pet. denied). The appellant must show that there is no evidence to support the factfinder's finding and that the evidence conclusively establishes the opposite of the finding. *See Dow*, 46 S.W.3d at 241 (citing *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989)); *TH Invs.*, 218 S.W.3d at 189-90. The ultimate test for legal sufficiency is whether the evidence would enable a reasonable and fair-minded factfinder to reach the verdict under review. *Wilson*, 168 S.W.3d at 827.

Here, Trotter concedes he bore the burden under the jury charge to establish that Bishop Petroleum failed to comply with the joint operating agreement. Thus, Trotter must establish on appeal that there is no evidence to support the jury's "No" answer to Question No. 3 asking if Bishop Petroleum failed to comply with the joint operating agreement. Trotter cannot do so on this record.

### A. Failure to Follow Oil and Gas Board Regulations

Trotter contends that Bishop Petroleum breached the joint operating agreement's requirement to follow applicable laws and regulations when it (1) failed to inform the Alabama Oil and Gas Board that there was a hole in the well's casing; and (2) proposed the workover in the July AFE without a plan to repair the hole. Trotter says Hellmich and Gore agreed that Bishop Petroleum was "required to report the casing leak to the Oil and Gas Board." Trotter further contends that "Bishop [Petroleum] admitted that it did not report the existence of a casing leak to the Board, and never denied its failure to submit a proposal to the Board to repair it." According to Trotter, Bishop Petroleum failed to perform "the appropriate casing test" and had a duty to report even a suspected hole to the Alabama Oil and Gas Board.

As discussed above, Trotter improperly assumes there was a hole in the casing at the time of the July AFE. This assumption is improper because the

11

evidence is disputed as to whether a hole existed. Some evidence supports the existence of a hole. Gore testified that he believed there was a hole in the casing at the time of the March 2007 workover. The memoranda accompanying the April and July AFEs stated that there was a hole in the tubing and the casing. Other evidence tends to support a contrary conclusion. Harry Bishop and Knippa testified that they suspected a hole in the casing but could not prove its existence at the time of the proposed July AFE. Harry Bishop and Knippa also testified that they conducted pressure testing on the casing during workover operations in November 2007 and confirmed there was no hole in the casing.

Trotter contends that Bishop Petroleum did not conduct an appropriate pressure test of the casing in order to establish the absence of a hole in the casing. He points to Gore's testimony to support this contention. Based on his review of the Alabama Oil and Gas Board rules, Gore testified that the standard for testing casing integrity "is a pressure test of a thousand pounds held for 30 minutes, with no more than 10 percent of that pressure being leaked off over that 30 minutes."

Hellmich did not testify regarding the Alabama Oil and Gas Board rules and requirements for testing casing integrity, and no regulations from this entity were introduced at trial.

Knippa testified that he decided to pressure test the casing for fifteen minutes at five hundred pounds because the casing had been in the well for fifteen years. Knippa further explained as follows:

> I picked five — we picked 500 pounds because this casing's been in this well for 15 years. When we drill a well, one of the — one of the things we have to do is we set — say, like, this — this surface casing. We set that surface casing prior to drilling out — the Railroad Commission, Alabama Oil and Gas Board, the Mineral Management Service that takes care of offshore — they require us to pressure test that casing, and most of the time they require us to pressure test it to a

12

thousand pounds. If you read through the regs with the Oil and Gas Board, they don't — as I recall, they don't tell you — pressure — pressure test to. They give you some limits, and not to — not to exceed, as I recall, 1,500 psi. So you — when you're drilling — that's new casing, so you have some confidence in it. But this stuff's been in this well now for 15 years, so I don't want to be pushing and pressure-testing to — to some point that might actually burst it or something like that. I want to have pressure integrity, but I don't want to be trying to destroy it. So that's why we used 500 pounds, and that's a pretty standard — standard number on — on older stuff like this.

Taken as a whole, the evidence does not conclusively establish that a hole existed at the time of the proposed July AFE, or that Bishop Petroleum's pressure tests in November 2007 were improper.

Further, Trotter's contention that Bishop Petroleum was required to inform the Alabama Oil and Gas Board of a suspected hole in the casing is not supported by conclusive evidence. At trial, Trotter's attorney asked Hellmich: "Is there any regulation that requires an operator to notify the Board of a suspected or a possible casing leak? In other words, they are permitted to go and try to test it before —." Hellmich responded: "Yes. I mean, there is not a particular rule that says 'You will notify us immediately.'" Additionally, Hellmich agreed that (1) if an operator merely suspected a hole, then the Board would not expect the operator to inform the Board "without further diagnostic procedures;" and (2) if the Oil and Gas Board was aware of a possible hole in the casing, then the Board would have required Bishop Petroleum "to determine whether it existed or not."

This record contains evidence tending to show that the Alabama Oil and Gas Board did not require Bishop Petroleum to report a suspected hole in the casing immediately. There is evidence that the Alabama Oil and Gas Board required Bishop Petroleum to determine if a hole in the casing existed. Here, the evidence shows that Bishop Petroleum devised a plan and pressure-tested the casing in order

13

to determine if the casing indeed had a hole.

Having reviewed the record, we conclude that Trotter cannot show there is no evidence to support the jury's "No" answer to Question No. 3 or that all of the evidence conclusively establishes that Bishop Petroleum breached the joint operating agreement's requirement to follow applicable laws and regulations.

### B. Failure to Provide Daily Workover Reports

Trotter argues that Bishop Petroleum breached the joint operating agreement as a matter of law because it refused to provide daily workover reports to all working interest owners even though one working interest owner, Claudia Campbell, specifically requested daily workover reports when she consented to the July AFE. Trotter argues that Bishop Petroleum was required to provide daily workover reports to all working interest owners under Article V.D.7(b) of the joint operating agreement. According to Trotter, Bishop Petroleum's failure to provide the reports to all working interest owners constituted a material breach because it prevented Trotter from proposing to plug the well when the workover costs became excessive.

Article V.D.7(b) states: "Operator will send to Non-Operators such reports, test results, and notices regarding the progress of operations on the well as the Non-Operators shall reasonably request, including, but not limited to, daily drilling reports, completion reports, and well logs." Article V.D.7(b) specifically states that an operator is required to provide reports that non-operators "reasonably request." It does not state that an operator is required to send any and all requested reports; rather, the request must be reasonable. It also does not state that an operator is required to send reports to all non-operators when one non-operator requests a report.

Trotter never requested any reports; Campbell was the only working interest owner who requested daily workover reports. Trotter does not point to any authority or evidence in the record that one working interest owner's request for reports obligated Bishop Petroleum to send reports to every working interest owner, including those who made no such request.

The jury also heard conflicting testimony with regard to whether Bishop Petroleum was required to provide daily workover reports to working interest owners. Trotter's expert, Dorsey Roach, opined that it is "custom and practice in the industry" to send daily reports of the workover operations to non-operators. Gore agreed that it is "custom and practice in the oil and gas industry to send a non-operator daily drilling reports" in a workover like the one conducted under the July AFE.

However, K. C. Weiner, one of the working interest owners under the joint operating agreement who consented to the July AFE and paid his share of expenses for the workover under the July AFE, testified to the contrary. Weiner has managed minerals exploration and production of oil and gas companies for 30 years, and has reviewed and negotiated hundreds of operating agreements. He opined that operators do not have to "provide working-interest owners copies of daily work-over reports." Weiner also testified that he was familiar with the joint operating agreement in this case, and that it does not require Bishop Petroleum as the operator of the well to provide daily workover reports. He further testified that it is not "standard in the industry" to provide such reports.

Based on the record before us, Trotter cannot establish that there is no evidence to support the jury's "No" answer to Question No. 3 asking whether Bishop Petroleum failed to comply with the joint operating agreement. He cannot show that the evidence conclusively establishes that Bishop Petroleum breached

15

the joint operating agreement because it did not provide such daily reports to all working interest owners, including those who had not requested them.

### C.    Failure to Issue a New AFE

Trotter contends that Bishop breached the joint operating agreement by failing to issue a new AFE when minor work outlined in the July AFE "became a major operation requiring 'fishing' procedures."  According to Trotter, his contention is supported by Roach's uncontradicted testimony.

Roach's testimony was not uncontradicted.  The jury heard conflicting testimony with regard to whether Bishop Petroleum was required to issue a new AFE under the joint operating agreement after a free point indicator tool got stuck in the well and fishing operations were necessary to retrieve the tool.

Roach opined that Bishop Petroleum should have issued a new AFE because the fishing operation that began on the second day was a "totally different, separate operation and — from what had been proposed and what had been approved."

Weiner disagreed with Roach.  Weiner opined that a reasonable and prudent operator would not have "dismissed the work-over rig and gotten a new AFE approval from the working-interest owners to conduct fishing operations to remove" a tool that got stuck in the well because "that's not an unusual occurrence."  Weiner testified that "[i]t's part of the considered operations of what you were doing.  I mean, that's within the realm of things that could go wrong when you're doing that kind of an operation.  And you don't know.  I mean, you might get it out in one hour or you might get it out in two or three days, and it just doesn't — it's not anything significantly different than what you're doing when you went in there.  This is just part of the issues you encounter when you go to conduct those operations."

16

Weiner also testified that AFEs do not have "huge contingencies for sticking tools and fishing" because everybody in the industry understands that "when you've approved an operation, you've approved basically everything associated with it," and "you don't plan for every possible contingency because otherwise, you could never come up with a complete answer."

Having reviewed the record, we conclude that Trotter cannot show there is no evidence to support the jury's "No" answer to Question No. 3 or that all of the evidence conclusively establishes that Bishop Petroleum breached the joint operating agreement by failing to issue a new AFE for fishing operations related to retrieving a tool that got stuck in the well.

Accordingly, we overrule Trotter's second issue.

### III. Damages Award against Trotter

We now turn to Trotter's third issue, in which he contends that the "portion of the jury's verdict attributable to Mr. Trotter's allegedly unpaid expenses under the July AFE is wrong as a matter of law" because Trotter did not consent to the July AFE and cannot be liable for amounts incurred under it.

The jury charge provided as follows:

QUESTION NO. 1

Did any of the following have an obligation to pay Bishop Petroleum Inc. their prorated share of expenses per the Joint Operating Agreement?

Answer "Yes" or "No" as to each of the following:

a.    <u>Yes</u>    William Trotter

    *        *        *

If your answer to Question 1 is "Yes", then answcr the following question. Otherwise, do not answer the following question.

QUESTION NO. 2

17

Was the obligation to perform by any of the following excused?

> Obligation to perform by Defendants is excused by Plaintiff's previous failure to comply with a material obligation of the same agreement.

Answer "yes" or "no" as to each of the following:

> a.    <u>No</u>    William Trotter

>            \*                       \*                       \*

If your answer to any one named [in] Question 1 is "Yes" and "No" to anyone in Question 2, then answer the following question. Otherwise, do not answer the following question.

QUESTION NO. 5

What sum of money, if any, if paid now in cash, would compensate Bishop Petroleum for the breach of the Joint Operating Agreement, if any, by the following?

> Answer in dollars and cents as to each, if any:

> a.    $336,393.42        William Trotter

The charge included no answer blank for Indian Oil in the liability or damage questions submitted in the charge.

Trotter contends that he assigned his interest in the well to Indian Oil in 2002, and that Indian Oil consented to the July AFE in 2007. Trotter therefore contends that he may be liable for obligations arising under the joint operating agreement that were incurred before the 2002 assignment, but he is not liable for work done under the July AFE in 2007 or thereafter.

In that regard, Trotter argues that, "in choosing which parties were potentially indebted to Bishop [Petroleum] under the JOA, the trial court erred" by failing to submit a jury question addressing whether Trotter is liable for expenses under the joint operating agreement after he assigned his working interest in the well to Indian Oil. Trotter argues that the trial court erroneously refused to submit his proposed jury question in reliance upon *Seagull Energy E & P, Inc. v. Eland*

18

*Energy, Inc.*, 207 S.W.3d 342 (Tex. 2006), and incorrectly assumed that he automatically is liable for all expenses incurred in this case.

Trotter preserved his charge error contention by objecting during the formal charge conference. Trotter stated: "Defendants object to the omission of a question on the assignment of Mr. Trotter's interest to Indian Oil. Proposed question should read: 'Is Defendant William E. Trotter, II, liable for any obligation under the joint — joint operating agreement subsequent to the assignment of his interest, subject to the J — JOA, to Indian Oil, L.L.C.?' We feel that the *Seagull* versus *Eland* case is distinguishable on facts and ask that that be — re-urge that that be included as a question." In response to Trotter's objection, the trial court stated: "Okay. Overruled."

According to Trotter, *Eland* does not support "saddling" him with Indian Oil's debts incurred under the July AFE. Under Trotter's reading, *Eland* stands for the proposition that a party who assigns its interest in a joint operating agreement remains liable for ongoing debts "limited to general operating costs—cost[s] that the original party agreed to accept" under the joint operating agreement unless the party was expressly or impliedly released from its obligations. Trotter contends that (1) he "agreed to various costs by signing the JOA;" (2) he "did not agree to additional costs that required additional consent from individual interest owners;" and (3) "reworking operations require specific, additional consent" under Article VI of the joint operating agreement.

Trotter concludes that the trial court submitted "an improper jury charge both by failing to ask the jury to address the impact of the assignment from Mr. Trotter to Indian Oil, and by failing to list Indian Oil as a potentially liable party anywhere in the charge." Trotter argues that the error led to an improper judgment requiring rendition of a take-nothing judgment in Trotter's favor. Alternatively,

19

Trotter argues that this court should reverse the trial court's judgment and "order a new trial to determine the damages severally attributable to Indian Oil and Mr. Trotter."

In response, Bishop Petroleum asserts that Trotter "seeks to avoid the express holding" of *Eland*. Bishop Petroleum asserts that Trotter remains individually liable for all expenses in this case under *Eland* because "the operating agreement did not expressly provide that Trotter's obligations under the operating agreement should terminate upon assignment and Bishop Petroleum did not expressly release Trotter following the assignment of [sic] its working interest" to Indian Oil.

We conclude that Bishop Petroleum misplaces its reliance on *Eland* when it argues that Trotter automatically is liable for **all** expenses at issue in this case notwithstanding the 2002 assignment of Trotter's working interest to Indian Oil.

*Eland* addressed whether the assignment of an oil and gas working interest released the assignor from further obligations to the operator under the operating agreement when the assignee failed to pay its share of operating expenses. *Eland*, 207 S.W.3d at 344. The operating agreement did not expressly terminate the assignor's obligations under the operating agreement upon assignment, and the assignee did not expressly release the assignor following the assignment of its working interest. *Id*. at 346 ("The operating agreement simply does not explain the consequences of an assignment of a working interest to a third party."). The supreme court held that the assignor cannot escape its obligations in these circumstances merely by assigning its working interest to a third party. *See id*. at 346-47.

The supreme court emphasized that the operating agreement at issue in *Eland* did not specifically address the consequences of assigning a working interest

20

to a third party. *See id.*; *see also Boldrick v. BTA Oil Producers.*, 222 S.W.3d 672, 677 (Tex. App.—Eastland 2007, no pet.). In other words, the operating agreement at issue contained no language expressly addressing who was liable following an assignment of a working interest and the specific expenses, if any, for which liability existed after assignment. *See Eland*, 207 S.W.3d at 346-47.

This case involves a different operating agreement and different circumstances. In *Eland*, the operating expenses at issue involved abandonment costs. *See id.* at 345-46. The expenses at issue here include reworking costs, which required special consent from the working interest owners under Article VI of the joint operating agreement.

More importantly, and contrary to the operating agreement at issue in *Eland*, the joint operating agreement at issue here is not silent on the key issue. The joint operating agreement signed by Bishop Petroleum and Trotter contains language specifically addressing liability after assignment of a working interest to a third party. Article VIII.D provides: "[N]o assignment or other disposition of interest by a party shall relieve such party of obligations previously incurred by such party hereunder with respect to the interest transferred, including without limitation the obligation of a party to pay all the costs attributable to an operation conducted hereunder in which such party has agreed to participate prior to making such assignments." Under this language, an assignor continues to be liable for "previously incurred" obligations predating the assignment.

Thus, Trotter is individually liable for obligations incurred before he assigned his working interest to Indian Oil in 2002 — as contrasted with an entirely new obligation incurred after the 2002 assignment.

Nothing in this record suggests that the obligation to pay for the workover under the July AFE is an obligation "previously incurred" by Trotter before the

21

2002 assignment. Trotter assigned his working interest to Indian Oil in January 2002 — at least five years before (1) Bishop Petroleum requested workover approval; and (2) Indian Oil elected to consent to the workover in August 2007. Because a working interest owner must specifically consent to reworking a well under the joint operating agreement, Trotter could not have incurred an obligation before the 2002 assignment to pay for expenses in 2007 and thereafter under the July AFE. The July AFE was a new operation presented by Bishop Petroleum and consented to by Indian Oil more than five years after Trotter's assignment to Indian Oil. Therefore, workover expenses under the July AFE cannot be considered to be an obligation Trotter previously incurred under the joint operating agreement.

Although we conclude that Trotter is not individually liable for workover expenses under the July AFE, we nonetheless reject Trotter's contention that the trial court abused its discretion by failing to submit his proposed jury question asking whether Trotter is "liable for any obligation under the . . . joint operating agreement subsequent to the assignment of his interest . . . ." Trotter acknowledges on appeal that he is liable for at least *some* obligations under the joint operating agreement even after the 2002 assignment to Indian Oil. He contends that he is not liable for the *entire* amount awarded against him individually in the jury verdict and the final judgment.

A trial court has broad discretion in submitting jury questions. *Last v. Quail Valley Country Club, L.P.*, No. 01-08-00759-CV, 2010 WL 1253782, at *4 (Tex. App.—Houston [1st Dist.] March 25, 2010, pet. denied) (mem. op.). Thus, we review any alleged jury charge error for an abuse of discretion. *Metro. Transit Auth. v. Harris Cnty.*, No. 14-06-00513-CV, 2008 WL 4354503, at *8 (Tex. App.—Houston [14th Dist.] Aug. 26, 2008, no pet.) (mem. op.). A trial court is

22

required to submit only controlling factual issues which are essential to a right of action or defense. *C & C Partners v. Sun Exploration and Prod. Co.*, 783 S.W.2d 707, 715-16 (Tex. App.—Dallas 1989, writ denied), *disapproved on other grounds by Formosa Plastics Corp. USA v. Presidio Eng'rs and Contractors, Inc.*, 960 S.W.2d 41 (Tex. 1998). The trial court does not err by refusing to submit an immaterial question. *See id.*

Trotter acknowledged in his brief and during oral argument that, notwithstanding the assignment, he is liable individually for at least some obligations arising under the joint operating agreement. There was no fact issue for the jury to decide with respect to a question framed to ask whether Trotter is "liable for any obligations under the JOA subsequent to the assignment . . . ." Based on Trotter's appellate arguments, the answer to his proposed question indisputably would have been "Yes." Because there was no fact issue to be resolved on the question as framed by Trotter, the question as framed was immaterial and the trial court properly refused to submit it. Trotter did not tender a proposed question apportioning damages between Trotter and Indian Oil, and he did not object to the omission of such a question.

We also reject Trotter's charge error argument insofar as he posits a fact issue regarding the existence of an implied release after assignment. *See Eland*, 207 S.W.3d at 347. This record contains no evidence tending to support the existence of an implied release.

After Trotter assigned his working interest in the well to Indian Oil in 2002, Bishop Petroleum distributed revenues and billed expenses to Indian Oil. This conduct establishes nothing beyond Bishop Petroleum's acquiescence in Trotter's assignment. But mere acquiescence to an assignment is not sufficient to support a finding of implied release. *See Cauble v. Hanson*, 249 S.W. 175, 180-81 (Tex.

23

Comm'n App. 1923, judgm't adopted).

We conclude that the trial court acted within its discretion when it rejected Trotter's proposed jury question.

Rejection of Trotter's charge complaint does not end the analysis regarding the scope of Trotter's individual liability after assignment. Trotter additionally argues that there is no evidence to support the amount awarded against him individually in response to Question No. 5. He contends that the jury's award of $336,393.42 against Trotter in answer to Question No. 5 encompasses amounts attributable to (1) obligations for which he is liable after the assignment; and (2) post-assignment workover obligations for which he is not liable based on the lease's "previously incurred" language. We agree.

The parties acknowledged during oral argument that the amount awarded against Trotter individually in response to Question No. 5 covers a range of expenses. This amount includes expenses for plugging and abandonment; expenses incurred under various other AFEs submitted between February and July 2007; monthly operating expenses; and workover expenses under the July AFE. During oral argument, Trotter also acknowledged that he is individually liable even after the assignment for plugging and abandonment expenses and monthly operating expenses.[3]

On the other hand, we have concluded that Trotter is not liable under the joint operating agreement for workover expenses attributable to the July AFE because this obligation was not "previously incurred" at the time of the 2002 assignment to Indian Oil.

_____

[3] Trotter stated that he continues to be liable after assignment for "general operations" but not for "new operations" such as the July AFE workover. He stated that he is individually liable for monthly operating expenses if there is no implied release based upon the assignment.

Because the damage award against Trotter encompasses amounts for which Trotter is liable individually, and additional amounts for which he is not liable individually, the evidence is insufficient to support the entire amount of damages awarded by the judgment against Trotter. Bishop Petroleum nonetheless presented sufficient evidence to support — at a minimum — damages against Trotter individually for plugging and abandonment expenses and monthly operating expenses.

Accordingly, although the evidence is legally sufficient to support a finding of damages in some amount against Trotter individually, it is legally insufficient to support the entire amount awarded against Trotter individually. *See Guevara v. Ferrer*, 247 S.W.3d 662, 669-70 (Tex. 2007); *Texarkana Mem'l Hosp., Inc. v. Murdock*, 946 S.W.2d 836, 841 (Tex. 1997). Further, "evidence of unsegregated damages among claims or parties is more than a scintilla of evidence of segregated damages." *Minn. Mining & Mfg. Co. v. Nishika, Ltd.*, 953 S.W.2d 733, 739 (Tex. 1997) (citing *Murdock*, 946 S.W.2d 836, 841 (Tex. 1997) and *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 12 (Tex. 1991)).

"[W]hen there is some evidence of damages, but not enough to support the full amount, it is inappropriate to render judgment." *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. and Research Corp.*, 299 S.W.3d 106, 124 (Tex. 2009); *see also ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 877-78, 880 (Tex. 2010); *Guevara*, 247 S.W.3d at 669-70. In such a situation, we may remand to the trial court for a remittitur or for a new trial. *Akin, Gump, Strauss, Hauer & Feld, L.L.P.*, 299 S.W.3d at 124.

Given the state of the evidence in this case, remittitur is not appropriate. Bishop Petroleum presented an unsegregated lump sum figure backed up by numerous invoices. Many of the expenses listed are not identified by or linked to

specific activities such as plugging and abandonment; various AFEs submitted between February and July 2007; monthly operating activities; and workover activities under the July AFE. On this record, there is no way to parse through all of Bishop Petroleum's invoices and allocate damages between amounts for which Trotter admits he is individually liable — such as the plugging and abandonment expenses — and amounts for which he is not individually liable — such as the workover expenses incurred under the July AFE.

A remand for a new trial solely on the damages issue is not appropriate in this case. Texas Rule of Appellate Procedure provides that "[t]he court may not order a separate trial solely on unliquidated damages if liability is contested." Tex. R. App. P. 44.1(b). Trotter has contested liability throughout this litigation. Bishop Petroleum sought unliquidated damages. Remand of both liability and damages is mandatory under these circumstances. *See id.*; *Nishika, Ltd.*, 953 S.W.2d at 740.[4]

## Conclusion

Having overruled Trotter's first and second issues and sustained Trotter's third issue,[5] we reverse the trial court's judgment against Trotter individually and remand this case for a new trial consistent with this court's opinion. We do not

---

[4] According to Bishop Petroleum, Trotter complains on appeal that "he is not liable in the capacity in which he has been sued." Bishop Petroleum further argues that Trotter's "answer does not allege lack of capacity and is not verified." Trotter responds in his brief that "Trotter is not arguing that he was sued in the wrong capacity." In fact, Trotter is not arguing lack of capacity; instead, he challenges the damage award and its supporting proof. Trotter acknowledges that he remains liable for obligations he incurred before assignment, and disputes liability for post-assignment obligations to which he did not consent. Thus, the issue Trotter presents is not whether Bishop Petroleum can recover against Trotter individually; rather, the issue is how much it can recover against Trotter individually. For this reason, we reject Bishop Petroleum's request to overrule Trotter's arguments based on the absence of a verified pleading alleging lack of capacity.

[5] In light of our disposition of Trotter's third issue, we need not address Trotter's fourth and fifth issues.

disturb the trial court's take-nothing-judgment as to Indian Oil because (1) the jury verdict and the trial court judgment do not award damages against Indian Oil; (2) the judgment denies all relief not expressly granted; (3) Indian Oil abandoned its appeal; and (4) Bishop Petroleum has not cross-appealed to challenge the trial court's take-nothing-judgment as to any claims by Bishop Petroleum against Indian Oil.


/s/     William J. Boyce
        Justice


Panel consists of Justices Boyce and McCally and Senior Justice Mirabal.[6]

---

[6] Senior Justice Margaret Garner Mirabal sitting by assignment.